565 A.2d 1170

**George FIELD and Dawn Field, Appellants.**

**v.**

**PHILADELPHIA ELECTRIC COMPANY; Bartlett Nuclear, Incorporated; Allen H. Hilsmeier, and C. Stuart Nelson.**

Superior Court of Pennsylvania.

Argued Feb. 1, 1989.

Filed Sept. 12, 1989.

Reargument Denied Nov. 14, 1989.

402

Lynne Bernabei, York, for appellants (admitted pro hac vice).

Rees Griffiths, York, for Philadelphia Elec., Hilsmeier and Nelson, appellees.

Michael W. King, York, for Bartlett Nuclear, appellee.

Before WIEAND, POPOVICH and HESTER, JJ.

HESTER, Judge:

This is an appeal from an April 29, 1988 order which granted appellees' demurrer to five counts of appellants' eight-count complaint.[1] George and Dawn Field (appellants) instituted this action against Philadelphia Electric Co., Bartlett Nuclear, Inc., Allen H. Hilsmeier, and C. Stuart Nelson (appellees) to recover for injuries resulting from an alleged intentional exposure to high levels of radiation and for lost wages due to alleged wrongful terminations. By its April 29, 1988 order, the trial court dismissed the counts of appellants' complaint which sought damages for intentional exposure to radiation, wrongful discharge, and intentional infliction of emotional distress, and it struck all of appellants' demands for punitive damages.

The trial court determined that: 1) the wrongful discharge claims and tort claim for intentional exposure to radiation were preempted by federal law; 2) there was no common law cause of action for intentional exposure to radiation; 3) appellants failed to state a claim under Pennsylvania law for wrongful discharge; 4) as a matter of law, there was no egregious conduct alleged in the complaint that would support a claim for intentional infliction of emotional distress; and 5) as a matter of law, punitive damages were not recoverable on the basis of the allegations in the complaint. We reverse and remand for proceedings consistent with this opinion.

1. By order dated June 30, 1988, we determined that this was a final, appealable order pursuant to *Praisner v. Stocker*, 313 Pa.Super. 332, 459 A.2d 1255 (1983).

Initially, we examine the facts upon which we base this adjudication. When preliminary objections in the nature of a demurrer are filed, we must accept as true all the well-pleaded material facts set forth in the complaint and all reasonable inferences deducible from those facts.[2] *Dercoli v. Pennsylvania National Mutual Insurance Co.*, 520 Pa. 471, 554 A.2d 906 (1989). Accepting these facts and inferences, we then determine whether the pleader has failed to state a claim for which relief may be granted, and we will affirm the grant of a demurrer only if there is certainty that no recovery is possible. *Creeger Brick & Building Supply Inc. v. Mid–State Bank and Trust Co.*, 385 Pa.Super. 30, 560 A.2d 151 (1989). All doubts are resolved in favor of the pleader.

Accordingly, for purposes of this appeal, we accept as true the following allegations, which are contained in appellants' complaint. George Field was employed by Bartlett Nuclear, Inc. ("Bartlett") and hired as an independent contractor by the Philadelphia Electric Co. ("PECO") to work at its Peach Bottom Nuclear Plant as a health physics technician. Bartlett is a corporation which provides personnel to manage operational problems at utilities which own and operate nuclear power plants. Appellee–Nelson and appellee-Hillsmeier are employed by PECO. Dawn Field was a secretary for an organization that provides services to PECO which relate to construction at PECO's Peach Bottom Nuclear Plant.

On February 6, 1985, as a result of a plant shutdown, George Field was directed by PECO personnel to enter an off-gas pipe tunnel in unit three of Peach Bottom. He observed standing water on the floor of the tunnel and

---

**2.** Appellees have set forth in their counter-statement of facts allegations which do not apply this standard. For example, they offer a reason other than the one pled in the complaint for appellants' discharge. We will ignore these counter statements to the extent they are contradicted by the allegations in the complaint. By filing preliminary objections in the nature of a demurrer, appellees have admitted the factual allegations of the complaint for purposes of court rulings on the preliminary objections. *Creeger Brick and Building Supply, Inc. v. Mid–State Bank and Trust Co.*, 385 Pa.Super. 30, 560 A.2d 151 (1989).

radioed to PECO personnel that he thought it unsafe to remain in the water. In response, he was ordered to test for radiation, which he did. After performing the tests, he returned from the tunnel and advised PECO personnel that the standing-water problem should not be resolved while the plant was being operated since it would be dangerous to work in the tunnel while the plant was operational.

Despite these warnings from Field, who was trained and hired in the area of safety control and cleanup, on March 1, 1985, while Peach Bottom was operating, PECO ordered Field and other personnel into the tunnel to resolve the standing-water situation. While Field was in the tunnel, PECO personnel deliberately vented radioactive gases into the tunnel where they knew Field was working. This action was taken in order to keep the reactor operating. The highly radioactive steam triggered a survey meter, a device in Field's possession that measures radiation levels. Field's survey meter went off-scale in the tunnel. As this indicates levels of radiation in excess of that permitted by the Nuclear Regulatory Commission ("NRC"), the federal agency in charge of regulating nuclear energy, Field immediately directed all personnel to leave the tunnel. He was not aware why the radiation level increased at that time. Two radiation detectors, one located at the tunnel entrance and another located at the control point to the tunnel, both alarmed when Field passed through them. This also indicated radiation exposure in excess of that permitted by NRC regulations. Field then analyzed air samples at the tunnel entrance with his survey meter, and the meter once again indicated radiation levels in excess of levels permitted by NRC regulations.

Field posted warning signs to the entrances to the contaminated areas, but PECO ordered the signs removed. Later that day, Field asked that his internal exposure to radiation be determined by equipment that was unavailable to him, but PECO refused the request and refused to answer his questions regarding the incident. Field also completed an incident report and asked his supervisor to

investigate his exposure level. His supervisor assured him that an investigation would occur.

On March 4, 1985, Field discovered that the reactor operators on March 1, 1985, had deliberately ordered the radioactive steam to be bypassed from the regular system and vented into the tunnel where the operators knew Field was working. This action was taken solely to keep the reactor operational. Field asked three other PECO personnel about the level of his exposure; he was assured that the matter was being investigated, and he was ordered not to discuss the incident with anyone. He also was told that a field badge he had worn during the March 1, 1985 incident, which is an instrument used to detect radiation exposure, indicated that he had not been exposed to radiation.

On April 22, 1985, Field asked his supervisor whether the NRC should be informed about the incident and told his supervisor that he wanted to be informed about the results of the investigation being conducted by PECO. Field told his supervisor that unless he received a report, he would contact the NRC. Field's inquiries in May, June, and July, about progress on the investigation were answered with assurances that the investigation was continuing. In late July, Field was told by his supervisor that the investigation was complete and documentation regarding the event had been discarded. Field then told his supervisor that he was going to report the incident to the NRC. Field contacted his supervisor at Bartlett, who promised to investigate the matter with upper management at PECO and Bartlett.

At one point during Field's inquiries about the incident, PECO personnel made two false statements to Field. They told Field that his field badge indicated that he had not been exposed to radiation on March 1, 1985. They also told him that on March 1, 1985, his survey meter had given an incorrect reading regarding the level of radiation due to moisture in the instrument.

On August 8, 1985, Field again was ordered into the off-gas tunnel at unit three to perform work. He performed tests on the standing water which established that it

contained such high levels of radiation that Field believed that he had been misinformed by PECO about the level of his exposure to radiation on March 1st. Later that day, Field demanded that water be retrieved from the tunnel for analysis.

In the meantime, on August 6 and 7, 1985, the NRC conducted an unannounced investigation of the March 1, 1985 incident, and its report was released on September 17, 1985. On September 23, 1985, Field was questioned about his role in the NRC investigation. On September 25, 1985, Field was terminated for alleged absenteeism. A subsequent NRC investigation of Field's termination lead it to conclude that Field had been terminated because he had reported his overexposure to radiation to the NRC. Subsequently, Dawn Field also was terminated for Mr. Field's activities.

The allegations of the complaint may be summarized as follows. PECO deliberately operated the Peach Bottom plant on March 1, 1985, in such a manner that Field necessarily was exposed to dangerous levels of radiation. This could have been avoided by shutting down one unit of its Peach Bottom reactor. PECO then deliberately lied to Field about his badge readings, a malfunction in his equipment on March 1, 1985, the extent of its investigations, and the extent of his exposure to radiation. PECO then deliberately exposed Field to dangerous levels of radiation again on August 8, 1985, by sending him back into the tunnel. Finally, PECO caused appellants to be fired due to the fact that Field reported the March 1, 1985 incident to the NRC.

We first address the issue of whether federal law has preempted count one of appellant's complaint, which is titled personal injury tort for intentional exposure to radiation.[3] The general rule of law regarding federal preemption is as follows:

The path to be followed in pre-emption cases is laid out by our cases. It is accepted that Congress has the

---

3. We discuss whether this is an actionable tort in the text, *infra.*

authority, in exercising its Article I powers, to pre-empt state law. In the absence of an express statement by Congress that state law is pre-empted, there are two other bases for finding pre-emption. First, when Congress intends that federal law occupy a given field, state law in that field is pre-empted. *Pacific Gas & Electric Co. v State Energy Resources Conservation and Development Comm'n*, 461 US 190, 212–213, 75 L Ed 2d 752, 103 S Ct 1713[, 1726–27] (1983). Second, even if Congress has not occupied the field, state law is nevertheless pre-empted to the extent it actually conflicts with federal law, that is, when compliance with both state and federal law is impossible, *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 US 132, 142–143, 10 L Ed 2d 248, 83 S Ct 1210 [1217] (1963), or when the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines v Davidowitz*, 312 US 52, 67, 85 L Ed 581, 61 S Ct 399 [404] (1941). *See*, e.g., *Silkwood v Kerr–McGee Corp.* 464 US 238, 248, 78 L Ed 2d 443, 104 S Ct 615 [621] (1984).

*California v. ARC America Corp.*, —— U.S. ——, ——, 109 S.Ct. 1661, 1665, 104 L.Ed.2d 86, 94 (1989).

█ In this instance, we are examining whether state tort law remedies are preempted. This is an area which is traditionally regulated by the states. *Id.; Silkwood v. Kerr–McGee Corp.* 464 U.S. 238, 249, 104 S.Ct. 615, 622, 78 L.Ed.2d 443 (1984). Accordingly, there is a strong presumption against finding preemption:

> When Congress legislates in a field traditionally occupied by the States, "we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Rice v Santa Fe Elevator Corp.* 331 US 218, 230, 91 L Ed 1447, 67 S Ct 1146 (1947).

*California v. ARC America Corp., supra*, —— U.S. at ——, 109 S.Ct. at 1665, 104 L.Ed.2d at 94.

■ In addition to these general federal preemption principles, we are guided by two United States Supreme Court decisions which specifically examine federal preemption in the nuclear sector. The Court's first pronouncement is contained in *Pacific Gas and Electric Co. v. State Energy Resources Conservation & Development Commission*, 461 U.S. 190, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983). The Court examined the Atomic Energy Act of 1954, 42 U.S.C. § 2011, *et seq.* (the "Act"), which relaxed the federal monopoly over nuclear technology and replaced it with a comprehensive system to promote private development of nuclear energy while attempting to safeguard the public from the risks of the new technology. Under the Act, states were permitted to continue their traditional role in the regulation of electricity generation.

Since the Act contains no express preemption clause, the Court in *Pacific Gas* examined Congressional intent to occupy the field of nuclear regulation. The Court noted that states have traditionally regulated utilities' development. The Court determined that the Act, however, did delegate to the Atomic Energy Commission (now the NRC) the exclusive jurisdiction to regulate the possession and disposition of nuclear materials. The Court also determined that the safety aspects of nuclear technology were exclusively a federal concern. The Court concluded that under the Act, the federal government maintains complete control over the "safety and 'nuclear' aspects of energy generation," *id.* at 213, but that the states retain their traditional authority relating to utilities except in that specified area. The Court thus ruled that the Act exhibited Congressional intent to occupy the field of nuclear safety regulation of the technological aspects of nuclear plants.

The ruling in *Pacific Gas* was clarified in *Silkwood v. Kerr–McGee Corp.*, 464 U.S. 238, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984). At issue was whether a state common law cause of action which permitted an award of punitive damages due to radiation exposure was preempted by the Act. The personal representative of Karen Silkwood's estate

brought a state tort action based on strict liability and negligence[4] against Kerr–McGee for injuries sustained by Ms. Silkwood when she was contaminated by plutonium. The jury awarded the estate both punitive and compensatory damages. Kerr–McGee argued that the state-authorized award of punitive damages fell within the preempted area outlined in *Pacific Gas* since it punishes and deters conduct related to radiation hazards. The Court in *Silkwood* ruled that Congress's decision to prohibit states from regulating safety aspects of nuclear development did not extend as far as Kerr–McGee suggested. The Court ruled that Congress had no intention of forbidding the states from providing remedies to those suffering injuries in a nuclear plant and that state tort remedies are not preempted by the Act.

In light of the Court's decision in *Silkwood,* there is absolutely no basis for the conclusion that any state tort action, especially one for intentional exposure to radiation, is preempted by the Act. Accordingly, we reverse the trial court's determination that count one of appellants' complaint is preempted by federal law.

Appellees' assertion that the Price–Anderson Act[5] amendments to the Act change this conclusion is patently frivolous.[6] *See Kiick v. Metropolitan Edison Co.,* 784 F.2d 490 (3rd Cir.1986); *Stibitz v. General Public Utilities Corp.,* 746 F.2d 993 (3rd Cir.1984). The Price–Anderson Act establishes an indemnification scheme whereby operators of licensed nuclear facilities are required to obtain a specified amount of private insurance against lawsuits premised upon exposure to radioactive materials. 42 U.S.C. § 2210(a), (b). The Price–Anderson Act then provides that the federal government will provide indemnification for an

4. The jury's award on these counts was later determined to be invalid in that the workmen's compensation laws of the state precluded these actions.

5. Pub.L. 85–256, 71 Stat. 576.

6. The 1988 amendments to the Price–Anderson Act do not apply to nuclear incidents occurring prior to its effective date and have no application to these proceedings since the incident occurred years prior to the effective date of the 1988 amendments.

additional specified amount of liability. 42 U.S.C. § 2210(c), (d). Thus it is clear that instead of preempting state tort actions based on exposure to radiation, the Price–Anderson Act expressly envisions them.[7] Any contrary conclusion is precluded by the legislative history of proceedings which occurred during the 1966 reenactment of the Price–Anderson Act. The Joint Committee on Atomic Energy stated upon its reenactment:

> Since its enactment by Congress in 1957 one of the cardinal attributes of the Price–Anderson Act has been its minimal interference with State law. Under the Price–Anderson System, the claimant's right to recover from the fund established by the act is left to the tort law of the various states....
>
> ....
>
> This approach to the problems discussed above is in keeping with the approach followed in enacting the original Price Anderson Act—namely, interfering with State law to the minimum extent necessary. In essence, the plan adopted permits the retention of State law with respect to the cause of action and the measure of damages.....

S.Rep.No. 1605, 89th Congress 2d Sess. 6, 9 (1966), *reprinted in,* 1966 U.S.Code Cong. & Ad.News 3201, 3206–09. Accordingly, it is beyond argument that under the *Silkwood* decision, appellants' count one is not preempted by the Act. Any amendments made to the Act since the *Silkwood* decision reinforce this conclusion.

Our next issue is whether the wrongful discharge counts in appellants' complaint are preempted under federal law. This issue must be examined under both the principles discussed above and in light of section 210 the Energy Reorganization Act, 42 U.S.C. § 5851. That section provides compensatory damages to an employee who has been

7. The only limit under the Act would be that a plaintiff or plaintiffs could not recover any award in excess of the limits set forth in the Act for one nuclear accident. 42 U.S.C. § 2210(e); *see also Bennett v. Mallinckrodt, Inc.,* 698 S.W.2d 854 (Mo.App.1985). Naturally, this determination only can be made after an award is entered.

discharged for reporting NRC violations to the NRC. It is, accordingly, a parallel remedy to that of any state-authorized action for wrongful discharge.[8]

■■■ Before proceeding with our analysis, we note our disagreement with the trial court's preemption analysis. The trial court ruled that appellants' wrongful discharge claims were preempted solely due to the fact that appellants had a federal remedy available. This is not the correct analysis in determining whether a federal statute preempts a state cause of action. As noted later, the United States Supreme Court specifically has disapproved of such an approach. Instead, the analysis should begin with the general principles discussed above. We first conclude that neither the Atomic Energy Act nor the Price–Anderson Act amendments preempt a state wrongful discharge action premised upon violations of the NRC regulations. A state wrongful discharge action does not directly attempt to regulate the technological or safety aspects of nuclear power plant operations and would not be preempted under the *Pacific Gas* decision. A wrongful discharge action provides a state tort remedy for safety violations and is similar to the state tort remedy examined by the Court in *Silkwood.* Accordingly, we view the *Silkwood* analysis as dispositive on the issue of whether the Atomic Energy Act preempts these wrongful discharge claims.

■■■ Next we must address whether section 210 of the Energy Reorganization Act, 42 U.S.C. § 5851, alters this conclusion. Section 5851 was enacted as part of the Energy Reorganization Act of 1974, 42 U.S.C. § 5801, *et seq.* ("ERA"). The purpose of the ERA is to develop reliable energy sources as well as to "advance the goals of restoring, protecting, and enhancing environmental quality, and to assure public health and safety." 42 U.S.C. § 5801(a). The ERA, *inter alia,* abolished the Atomic Energy Commission and transferred most of its power to the NRC. The

8. We consider later in this opinion whether the allegations in the complaint state a cause of action for wrongful discharge under Pennsylvania law.

ERA also provides that any individual of a firm operating a licensed nuclear facility who obtains information which indicates that the facility has failed to comply with any provision of the NRC regulations is required to notify the NRC of the failure. 42 U.S. § 5846. Such individual is subject to a fine for failing to report the violation. Section 210 of the ERA, 42 U.S.C. § 5851, is designed to protect an employee of a nuclear licensee if he complies with the reporting requirements. Section 5851 provides in part that if an employee believes he has been discharged for complying with ERA requirements, he *"may,* within thirty days after such violation occurs, file ... a complaint with the Secretary of Labor ..." 42 U.S.C. § 5851(b) (emphasis added). Compensatory damages in the nature of wrongful discharge damages are authorized if an employee's discharge is determined to be in retaliation for the employee's reporting of NRC violations.

Now we examine whether 42 U.S.C. § 5851 should be interpreted to preempt any similar state wrongful discharge action under the general federal preemption principles discovered above. The ERA, and specifically section 5851, does not expressly preempt any state laws. Accordingly, we must determine whether Congressional intent to occupy the field of wrongful discharge in the nuclear sector is evident from the ERA. In so doing, we must take note of the fact that a wrongful discharge is a state tort remedy, within the traditional police powers of the states, *Lingle v. Norge Division of Magic Chef, Inc.,* 486 U.S. 399, 108 S.Ct. 1877, 100 L.Ed.2d 410 (1988), and there is a presumption against preemption unless that was the clear and manifest purpose of the federal act. Furthermore, we are guided in this analysis by the purpose of the ERA which is to promote new energy sources consistently with public protection.

Initially, we express our disagreement with the main argument advanced by appellees in support of the trial court's conclusion that the ERA does preempt the cause of action. Appellees suggest that since appellants had a federal remedy available to them, they are precluded from as-

serting this state action. This superficial analysis of the federal preemption area is incorrect. In fact, the United States Supreme Court expressly and recently has ruled that the fact that a state tort remedy provides relief that is in addition to that provided by a federal statute cannot be a basis for the conclusion that the state tort remedy has been preempted. *California v. ARC America Corp., supra,* —— U.S. at ——, 109 S.Ct. at 1667, 104 L.Ed.2d at 97. Many of the cases relied upon by appellees in their preemption argument are no longer viable authority in light of the *Lingle* decision. *E.g., Olguin v. Inspiration Consolidated Copper Co.,* 740 F.2d 1468 (9th Cir.1984).

We conclude that section 5851 of the ERA was not intended to preempt any parallel state remedy for the same conduct for three reasons. First, the statute does not provide that its provisions shall be exclusive. Second, the language of the statute is precatory, not mandatory. It provides that an employee *may* file a complaint with the Department of Labor if he believes he has been fired for reporting an NRC violation. Finally, the ERA does not create a special administrative agency designed and trained to function as a mechanism for handling claims under its provisions.

Normally, traditional state remedies will not be preempted unless the remedy conflicts with federal law or stands as an obstacle to the accomplishment of its purpose. Since a state wrongful discharge action would provide the same remedy as that made available in a more limited way by 42 U.S.C. § 5851, such an action actually is consistent with the federal objectives and aids in the accomplishment of those objectives. Accordingly, a state discharge remedy premised upon ERA violations is not inconsistent with its purpose nor does it stand as an obstacle to the accomplishment of its goals. Consequently, there is no basis for concluding that the ERA preempts a state wrongful discharge claim premised upon ERA violations. *See California v. ARC America Corp., supra,* where the Supreme Court ruled that a state anti-trust law allowing recovery of damages to persons not

permitted recovery under federal anti-trust laws was not preempted where there was no express federal policy against the states imposing liability in addition to that imposed by federal law. The Court stated, "Ordinarily, state causes of action are not pre-empted solely because they impose liability over and above that authorized by federal law, . . . ." *Id.*, —— U.S. at ——, 109 S.Ct. at 1667, 104 L.Ed.2d at 97.

In accord with our conclusion is *Stokes v. Bechtel North American Power Corp.*, 614 F.Supp. 732 (N.D.Cal.1985) (42 U.S.C. § 5851 did not preempt state wrongful discharge action for termination in retaliation for refusal to suppress information concerning quality assurance problems at a nuclear power plant); *see also Wheeler v. Caterpillar Tractor Co.*, 108 Ill.2d 502, 92 Ill.Dec. 561, 485 N.E.2d 372 (1985) (42 U.S.C. § 5851 did not preempt state law retaliatory discharge claim where discharge was allegedly based on employee's refusal to handle nuclear materials in violation of NRC regulations).

■ The next issue before us is whether count one of appellants' complaint, entitled tort of intentional exposure to radiation, states a cognizable cause of action.[9] We conclude that it does. In the count, appellants allege that PECO deliberately exposed Field to radiation by operating the reactor knowing that Field would be exposed to dangerous levels of radiation and by deliberately venting radioactive steam on Field knowing his location.[10] We believe this states a cause of action in battery. *See* Restatement (Second) of Torts § 13 (battery requires intent to cause offensive contact and resultant harmful contact). The intentional

9. We note that on appeal, Bartlett has not attempted to distinguish its liability in terms of its actions from that of PECO's liability for its actions. The issue before us is framed as whether the allegations in count one state a cause of action. Since the parties did not make any distinction between PECO and Bartlett in terms of our ruling even though only PECO's actions are involved, our discussion does not distinguish between the two appellees.

10. We must repeat at this point that due to the procedural posture of this case, appellees have admitted these facts for purposes of this appeal.

act of venting steam where the steam produced the contact is sufficient to state an actionable battery. *See* Restatement (Second) of Torts § 18 comment c (intent to contact someone with offensive foreign substance constitutes contact for purposes of battery).

*Barber v. Pittsburgh Corning Corp.*, 365 Pa.Super. 247, 529 A.2d 491 (1987), *reversed on other grounds*, 521 Pa. 29, 555 A.2d 766 (1989), provides a dispositive analysis on whether an "intent" to cause harmful contact is present based on the allegations in appellants' complaint. There, the plaintiffs alleged that the defendants deliberately exposed plaintiffs to asbestos above safe levels knowing that the exposure would cause serious bodily injury and death. Here, appellants allege that PECO deliberately exposed Field to unsafe levels of radiation knowing that serious bodily injury is a likely result of this exposure. We ruled in *Barber* that an intentional tort was established by these identical allegations. We noted that intent in the context of tort litigation is defined to include the desire to bring about the likely consequences of an intentional act. Thus, intent extends both to the desired consequences and to the consequences substantially certain to follow from the act.

Instantly, the intent to contact is established by the deliberate venting of steam on Field, with knowledge of his whereabouts. Under *Barber*, the fact that PECO did not intend to harm Field is immaterial. If there is intentional contact, the consequences substantially certain to follow from such contact are within the scope of the tort. *See* Restatement (Second) of Torts § 16(1) (if the contact is intended, "the actor is liable to the other for a battery although the act was not done with the intention of bringing about the resulting bodily harm"); *see also id.* § 13 comment c (if actor intends contact, a desire to injure is immaterial to whether battery is present).

Thus, we reject appellees' contention that no cause of action exists solely due to the fact that they did not intend to harm Field. They did intend for him to come into contact with the radiation according to the allegations in the com-

plaint. We also note that appellees' proffered justification for the act, which in this case is that they needed to keep the plant operational, does not prevent them from being subject to liability for battery. *See Id.* § 13, comment c (fact that actor believes his actions were justified and necessary does not relieve actor from liability). Accordingly, we conclude that count one states a cause of action in battery under Pennsylvania law.

■ Next, we must determine whether appellants, who were at-will employees, have stated a claim under Pennsylvania law for wrongful discharge.

> Historically, Pennsylvania has recognized an employer's unfettered right to discharge an at-will employee for any or no reason in the absence of a contractual or statutory prohibition. *Henry v. Pittsburgh and Lake Erie Railroad Company*, 139 Pa. 289, 21 A. 157 (1891). That right has been tempered with the emergence of the common law doctrine of wrongful dismissal whereby an employee may premise a cause of action on either tort or contract principles. H. Perritt, *Employee Dismissal Law and Practice* (1984). Because appellant was clearly an at-will employee, the only issue before this Court is whether appellant's discharge falls within the limited exception that has emerged in this state allowing recovery for a termination of employment that has violated a significant and recognized public policy. *Novosel v. Nationwide Insurance Company*, 721 F.2d 894 (3rd Cir.1983).

*Hineline v. Stroudsburg Electric Supply Co.*, 384 Pa.Super. 537, 559 A.2d 566, 568 (1989).

We recognize that the extent to which public policy limits an employer's control over his business must be determined on a case by case basis. *Id., citing Yaindl v. Ingersoll–Rand Company*, 281 Pa.Super. 560, 572, 422 A.2d 611, 617 (1980). An essential element in permitting a cause of action for wrongful discharge is a finding of a violation of a clearly defined mandate of public policy which "strikes at the heart of citizen's social right, duties, and responsibilities." *Id.* The public policy exception is a narrow one. *Id.*

Since the wrongful discharge action first was recognized as cognizable in *Geary v. United States Steel Corp.*, 456 Pa. 171, 319 A.2d 174 (1974), it is now settled law in Pennsylvania that if the discharge of an employee-at-will threatens public policy, the employee may have a cause of action against the employer for wrongful discharge. *Yaindl v. Ingersoll–Rand Co., supra.*

In *Reuther v. Fowler & Williams, Inc.*, 255 Pa.Super. 28, 386 A.2d 119 (1978), we recognized a cause of action for wrongful discharge when an employee was discharged for performing jury duty. We noted that under Pennsylvania law, a person is statutorily required to serve when called for jury duty, and we determined that the necessity of having citizens available for our constitutionally-granted trials is a recognized public policy. We concluded that when an employee is discharged for fulfilling this statutory duty, he has a cognizable wrongful discharge claim.

By contrast, in *Geary v. United States Steel Corp., supra*, the Supreme Court ruled that the discharge of an employee for complaining about allegedly defective products to management did not state a cognizable claim under Pennsylvania law. The court noted that the plaintiff was not an expert on matters of public safety and that he had by-passed his immediate supervisors to criticize the product. The court determined that no clear mandate of public policy was present in that instance and that any public policy implications present in that case were outweighed by the company's legitimate interest in preserving normal operational procedures from disruption.

Similarly, in *Hineline v. Stroudsburg Electric Supply Co., supra*, we ruled that a wrongful discharge was not presented where the employee alleged that he was discharged for dismantling his employer's illegal video camera. We noted that the employee had "no authority nor statutory right to disengage the surveillance system installed by his employer." *Id.*, 384 Pa.Super. at 542, 559 A.2d at 569, and had no excuse for failing to follow proper channels, such as informing the police of the device. We concluded, there-

fore, that there was no compelling public policy to justify the employee's behavior and thus to support his action for wrongful discharge. *See also McGonagle v. Union Fidelity Corp.*, 383 Pa.Super. 223, 556 A.2d 878 (1989) (since legislation could be reasonably interpreted in accordance with employer's position that it had not violated legislation, employee was not ordered to perform illegal or unauthorized act under legislation; accordingly, there was no well-recognized facet of public interest at stake and wrongful discharge action was not cognizable).

Instantly, appellants allege that they were discharged because Field reported violations of the NRC regulations to the NRC. Under the ERA, Field was required statutorily to report these violations. Thus appellants were fired because Field performed a duty he was required to perform under federal law. The federal law at issue was designed to protect the health and safety of the public against the dangers of radiation. Far from being unsubstantiated or unclear, the dangers to the public are well-recognized, substantiated, and matters of great public concern, as evidenced by the Three Mile Island and Chernobyl incidents. In addition, Field's action of reporting NRC regulations directly advanced the public concerns addressed by the ERA.

Thus, this case falls squarely within the reasoning of *Reuther.* Furthermore, the precedent to the contrary is readily distinguishable. There is nothing in the complaint which indicates that Mr. Field bypassed normal operations, as did the plaintiff in *Geary.* Mr. Field went to his supervisors first and only resorted to the NRC after PECO lied to him about the survey meter and field badge and destroyed its report of the incident.

Also significant is the fact that Mr. Field was an expert in this area, knew about NRC regulations, and knew that PECO's actions were not in compliance with them. The plaintiff in *Geary* had no qualifications in the product safety area in which he made complaint. Furthermore, Field's exposure to radiation is not the only factor to be

considered in this case; possible public exposure may be present due to the March 1, 1985 incident. Further, as noted above, the risks of radiation are clear. This can be contrasted to the public safety issue presented in *Geary,* where the alleged product defects were vague and unsubstantiated and public safety was not clearly implicated.

Thus, accepting the allegations in the complaint as true, Field reported an incident to the NRC which he was required to report under federal law. PECO was making a concerted effort to conceal the incident, and Field was fired for making his report. Field's duty to report the violation is based on a federal statute designed to protect the public against the danger of radiation. We believe that the public must know of possible radioactive exposure consistent with the mandates of the ERA. Since a statutory duty to act is present, since discharge was based on performance of that statutory duty, and since performance of that duty directly and clearly protects public safety, we believe a cause of action for wrongful discharge exists in this case. *Accord Wheeler v. Caterpillar Tractor Co., supra* (there is no public policy more important or fundamental than the protection of citizens from the hazards of nuclear material and a state law claim for retaliatory discharge is present when the employee alleges he was fired for refusing to work with materials where the handling was not in conformity with NRC regulations); *see also Woodson v. AMF Leisureland Centers, Inc.,* 842 F.2d 699 (3rd Cir.1988) (where employee was fired for refusing to serve a visibly intoxicated person, which violates Pennsylvania law, wrongful discharge claim is present); *Sheets v. Teddy's Frosted Foods, Inc.,* 179 Conn. 471, 427 A.2d 385 (1980). In *Sheets,* the employee was hired for an indefinite term as a quality control director and operations manager of the defendant, a food manufacturer. The employee noticed deviations from the specifications contained in the defendant's standards and labels for vegetables and meat components which went into making its products. These deviations also constituted violations of the Connecticut Uniform Food, Drug and Cosmetic Act.

When plaintiff wrote the defendant concerning the use of substandard materials, his recommendations were ignored and he was fired. The court concluded that the lower court's grant of the defendant's motion for a demurrer was error in that the act under consideration was intended to protect the health and welfare of the public from produce and merchandising deceit and the plaintiff acted to protect the public's safety and himself from criminal sanction. This exception to the at-will doctrine is extremely narrow, premised as it is upon ERA violations.

Appellees rely heavily upon *Clay v. Advanced Computer Applications, Inc.*, 522 Pa. 86, 559 A.2d 917 (1989), in support of their argument that we should not recognize a wrongful discharge action premised upon allegations that the ERA was violated. We believe that a comparison of the act examined by the court in *Clay* actually supports our conclusion that a wrongful discharge action should be recognized in this case. In *Clay*, the Pennsylvania Supreme Court reversed our conclusion that a plaintiff states a cognizable wrongful discharge claim by alleging that he has been discharged in violation of the Pennsylvania Human Relations Act (PHRA). The supreme court ruled that an action for violation of the PHRA must be brought in accordance with the terms of the PHRA. The court stated that since the plaintiff failed to seek redress through the Pennsylvania Human Relations Commission (PHRC) as provided by the PHRA, she was barred from judicial recourse for violations of any rights protected by the PHRA. The court reached this result based solely on two statutory characteristics of the PHRA; both notably are absent from the ERA.

First, the PHRA provides that an employee's right to be free from prohibited discrimination "shall" be enforceable "as set forth in the PHRA." 43 P.S. section 953. By contrast, the ERA provides that an employee who has been discharged for reporting NRC violations "may" file a complaint with the Department of Labor under 42 U.S.C. section 5851. The supreme court in *Clay* determined that the legislature's use of the word "shall" as opposed to "may"

was expression of its intent to make administrative procedures under the PHRA a mandatory rather than discretionary means of enforcing rights created under the PHRA. Thus, the distinction drawn by the court in *Clay* reinforces our conclusion that 42 U.S.C. section 5851 was not intended to be the exclusive means of enforcing the ERA since it states that an employee "may" bring an action with the Departments Labor to enforce his rights under the ERA.

Second, in the PHRA, the legislature created a new, special administrative body, the PHRC, designed to deal solely with prohibited discrimination. The supreme court interpreted this as providing evidence that the legislature intended that the PHRC would bring its particular expertise to bear in handling discrimination claims and that judicial resources would be wasted or inconsistent with this stated preference to have the PHRC handle those claims. By contrast, the ERA does not create a special administrative agency to deal with violations of that act. Instead, the Department of Labor, an extant body which resolves a myriad of labor disputes, was designated as the agency to hear ERA violations. The Department of Labor has no more apparent expertise than the courts in resolving ERA violations. Thus, this evidences that the legislature did not intend that the Department of Labor be the better body for resolving these claims.

In conclusion, we reject the argument that Congress intended that the provisions of the ERA could be enforced only as provided in that act. There is nothing inconsistent with the ERA in our decision to allow a state wrongful discharge action premised upon violations of the ERA. Unlike the PHRA, or even the federal Age Discrimination in Employment Act, the ERA does not contain a full and adequate remedy for employees who report violations in compliance with the ERA. They are given only thirty days to file a complaint. No elaborate administrative scheme and regulatory body are created in the ERA. *Compare Murray v. Commercial Union Insurance Co.*, 782 F.2d 432 (3rd Cir.1986) (since PHRA and ADA provide adequate

remedies for violations of their stated public policies, there is no common law cause of action for wrongful discharge premised upon violations of those statutes); *accord Chekey v. BTR Realty, Inc.,* 575 F.Supp. 715 (Md.1983).

We reject appellees' argument that if we recognize a wrongful discharge action in this proceeding, we are "creating" a common law tort relying upon statutorily-created rights where violation of the rights are remedied by the statute. We are utilizing the statute in order to ascertain whether there are public policy considerations present for purposes of a wrongful discharge claim. Wrongful discharge actions were recognized as actionable by the Pennsylvania Supreme Court in *Geary,* and we merely are using the ERA to find a stated public policy. *See Cisco v. United Parcel Services, Inc.,* 328 Pa.Super. 300, 306, 476 A.2d 1340, 1343 (1984) (sources of public policy include legislation).

Our inquiry does not conclude here, however. Even where an important public policy is involved, an employer may discharge an employee if he has separate, plausible reasons for doing so. *Rineheimer v. Luzerne County Community College,* 372 Pa.Super. 480, 539 A.2d 1298 (1988). However, due to the procedural posture of this case, we are unable to determine whether appellees had a legitimate reason for firing Field. By filing the demurrer, appellees have admitted the allegations of the complaint that Field was fired solely for reporting the NRC violations. Contrary to appellees' assertions, there is no plausible, legitimate reason for appellants' discharges apparent from a reading of the complaint.

There is no indication that Field was disrupting normal plant operations by making reasonable inquires about the amount of his radiation exposure. He was expressing a legitimate concern for his health. There also is no indication that he failed to follow the normal chain of command in making those inquiries. The complaint states repeatedly that he directed all his inquiries to his immediate supervisor. Finally, the complaint clearly states that the proffered reason for termination, which was absenteeism, was "al-

leged." This implies that Field was not fired for absenteeism. In ruling on a demurrer, we accept as true all reasonable inferences from the allegations contained in the complaint. A reasonable inference from appellants' placement of the word "alleged" prior to absenteeism is that Field was not fired for absenteeism. This inference is confirmed when read in conjunction with Field's allegation that he was fired for reporting the incident to the NRC. Consequently, there is no plausible, legitimate reason for appellants' terminations apparent from our reading of the complaint, and appellants have stated a wrongful discharge action under Pennsylvania law.

■■■■ We next address the issue of whether the trial court properly struck appellants' requests for punitive damages. As a general guide in this area, we must utilize the principles contained in Restatement (Second) of Torts section 908(2). *See Martin v. Johns–Manville Corp.*, 508 Pa. 154, 494 A.2d 1088 (1985). That section provides:

(2) Punitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others. In assessing punitive damages, the trier of fact can properly consider the character of the defendant's act, the nature and extent of the harm to the plaintiff that the defendant caused or intended to cause and the wealth of the defendant.

In determining whether the actor exhibited "reckless indifference to the rights of others" so as to provide a basis for an award of punitive damages, we must analyze whether the complaint's allegations establish that the actor actually knew or had reason to know of facts which created a high risk of physical harm to plaintiff. Further, the defendant must have proceeded to act in conscious disregard of or indifference to that risk. *Martin v. Johns–Manville Corp., supra.* If the defendant actually does not realize the high degree of risk involved, even though a reasonable man in his position would, the mental state required for the imposition of punitive damages under Pennsylvania law is not

present. If that mental state is present, a jury question on the issue of punitive damages exists. Punitive damages are available in Pennsylvania only for outrageous conduct, which must be deterred, and which evidences a reckless indifference to the plaintiff's safety. In deciding whether punitive damages are assessable, the motive for the tort-feasor's act must be taken into account, not just the nature of the act itself. The imposition of damages to punish a civil defendant is appropriate only where the conduct is egregious. *Id.*

■ Under the allegations of the complaint, it is clear that PECO acted with the requisite mental state to warrant denial of a demurrer. Field told supervisors at PECO that it was dangerous to operate the reactor while remedying the standing water problem. Accordingly, PECO actually knew of the dangers to which Field was to be exposed on March 1, 1985, when it sent him to remedy the standing-water problem while keeping the plant operational. Further, it intentionally vented radioactive steam on Field solely to keep its reactor operational. Thus, the nature of PECO's actions do support imposition of punitive damages since those actions evidence the reckless indifference to Field's safety required by *Martin.* *See also Kirkbride v. Lisbon Contractors, Inc.,* 357 Pa.Super. 322, 516 A.2d 1 (1986), *reversed on other grounds,* 521 Pa. 97, 555 A.2d 800 (1989) (punitive damages may be awarded for conduct that is outrageous either due to defendant's motives or his reckless indifference to the rights of others).

We believe that since the requisite mental state required for the imposition of punitive damages is alleged in the complaint, grant of a demurrer was premature. A demurrer is appropriate only if there is a certainty that no recovery is possible, and all doubts must be resolved in favor of the pleader. PECO suggests that since its motivations were economic, its behavior was not outrageous as a matter of law. We categorically reject this suggestion. Assuming the allegations in the complaint are established, a jury may determine that the fact that PECO's actions were

motivated by economics, *i.e.*, keeping the reactor on-line, makes its behavior more not less reprehensible. Thus, PECO's allegedly deliberate acts, performed to keep its reactor on line and performed with the actual knowledge that these acts would expose Field to dangerous levels of radiation, may in a jury's mind amount to outrageous behavior which must be deterred and which warrants the imposition of punitive damages. According to the complaint, PECO only had to shutdown its reactor to avoid venting highly radioactive steam on Field and his co-workers. Accordingly, we reverse the trial court's decision to strike appellants' requests for punitive damages.

 For similar reasons, we are compelled to reach the same conclusion as to the demurrer granted on appellants' count relating to intentional infliction of emotional distress. Appellants allege that Field has suffered severe emotional distress from learning of his overexposure to radiation as well as from appellees' misrepresentations about his exposure. In *Pierce v. Penman*, 357 Pa.Super. 225, 515 A.2d 948 (1986), we examined the type of conduct which is necessary to support an award for intentional infliction of emotional distress. Restatement (Second) of Torts § 46 contains the relevant description of this tort, and it provides, **"Outrageous Conduct Causing Severe Emotional Distress** (1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." To support an action under section 46, defendant's conduct must be both extreme and outrageous. Accordingly, it is not enough that we have concluded that the allegations of the complaint support a finding that PECO's conduct was outrageous. We must also ascertain whether PECO's conduct also can be viewed as extremely outrageous. Comment d to section 46 explains the meaning of extreme and outrageous conduct:

> *Extreme and outrageous conduct.* The cases thus far decided have found liability only where the defendant's

conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!" The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind. There is no occasion for the law to intervene in every case where someone's feelings are hurt.

We note in connection with this count, the fact that PECO deliberately vented a deadly substance on Field is not the only behavior at issue. PECO's actions in this regard could be considered criminal. However, they also deliberately made two false statements to him to conceal these actions. They told Field that his badge readings indicated that he had not been exposed to radiation, and they told him that his survey meter had malfunctioned when it indicated that he had been exposed to radiation. These falsehoods also evidence criminal intent. We can visualize no conduct more outrageous in character, so extreme in degree, that went beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community, than to vent highly radioactive steam upon another. Furthermore, this was an intentional act. Appel-

lees elected to do this to him and then attempted to conceal the resulting situation.

The cases relied upon by appellees are procedurally distinguishable. *See Kazatsky v. King David Memorial Park, Inc.*, 515 Pa. 183, 527 A.2d 988 (1987); *Buczek v. First National Bank*, 366 Pa.Super. 551, 531 A.2d 1122 (1987). In those cases, nonsuits against the plaintiffs were granted on the ground that the plaintiffs had failed to introduce evidence that they had received medical assistance for their alleged emotional distress and thus failed to establish their claims that they had suffered emotional distress as a result of defendants' conduct. Instantly, Field has not had the opportunity to prove that he did seek medical assistance for emotional distress as a result of this matter. He must be granted that opportunity.

In accordance with the foregoing, the order is reversed and the case is remanded for proceedings consistent with this opinion. Jurisdiction relinquished.