Andrew S. HANSON, Plaintiff,

v.

**GICHNER SYSTEMS GROUP, INC., Defendant.**

**Civ. A. No. 1:CV–92–1167.**

United States District Court, M.D. Pennsylvania.

Aug. 18, 1993.

Sidney L. Gold, Lovitz V. Gold, P.C., Philadelphia, PA, for plaintiff.

Stephen Aloysius Moore, McNees, Wallace & Nurick, Harrisburg, PA, Thomas D. Yannucci, Ellen L. Lyons, Kirkland & Ellis, Washington, DC, for defendant.

### MEMORANDUM

CALDWELL, District Judge.

We exercise jurisdiction over this common law wrongful discharge case under 28 U.S.C. § 1332(a) and we are considering Defendant's motion for summary judgment.

### I. Facts and Procedural History

Defendant, Gichner Systems Group, Inc. ("Gichner"), manufactures military equipment. In 1985, Plaintiff Andrew Hanson began working for Gichner as a design engineer. A year later, he was promoted to sales engineer, a position which required him to respond to requests for proposals, prepare bids and estimates, and explain contracts to other Gichner personnel.

Plaintiff claims that the president of the company, Charles Atwood, asked him to lie to federal investigators from the General Ac-

counting Office ("GAO") concerning the conduct of two Gichner employees in their handling of a government contract. He claims he refused and was fired a month later.

Defendant argues that the Plaintiff's own deposition testimony indicates that he was never asked to give false information. Further, Defendant contends that there were several separate, legitimate reasons for Plaintiff's discharge.

On July 23, 1992, Plaintiff filed in the Court of Common Pleas for York County, Pennsylvania, a lawsuit alleging wrongful discharge and intentional infliction of emotional distress. On August 26, 1992, Gichner removed the case to this court. On October 8, 1992, we ordered the intentional infliction of emotional distress claim stricken. Defendant filed the current motion for summary judgment on July 7, 1993.

### II. Law and Discussion

#### A. Standard for Summary Judgment

Summary judgment is appropriate when there remain no genuine issues as to any material facts and judgment may be entered as a matter of law. Fed.R.Civ.P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When a movant submits that there is no genuine issue as to a material fact, its opponent must do more than "simply show that there is some metaphysical doubt as to the material facts." Matsushita Electric Industrial Co., Ltd., et al v. Zenith Radio Corp., et al., 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

#### B. Wrongful Discharge

As Plaintiff recognizes, he comes to this lawsuit with a heavy burden. Pennsylvania law strongly favors at-will employment and allows only narrow exceptions to that presumption. Burkholder v. Hutchison, 403 Pa.Super. 498, 589 A.2d 721, 723 (1991). One such deviation from the at-will doctrine is the public policy exception, first enunciated by the Pennsylvania Supreme Court in Geary v. United States Steel Corp., 456 Pa. 171, 319 A.2d 174 (1974). To maintain a case under this exception,

the employee must show a violation of a clearly mandated public policy which "strikes at the heart of a citizen's social rights, duties and responsibilities."

*Turner v. Letterkenny Federal Credit Union*, 351 Pa.Super. 51, 505 A.2d 259, 261 (1985), *quoting Novosel v. Nationwide Insurance Company*, 721 F.2d 894, 899 (3d Cir. 1983). The Pennsylvania courts have clearly pronounced the public policy exception to be an exceptionally narrow one. *Burkholder*, 589 A.2d at 724.

The Pennsylvania Superior Court has, however, recognized three exceptions: (1) an employee may not be fired for serving jury duty, *Reuther v. Fowler & Williams, Inc.*, 255 Pa.Super. 28, 386 A.2d 119 (1978), (2) an employer may not deny employment to a person because of a prior conviction for which that person has been pardoned, *Hunter v. Port Authority of Allegheny County*, 277 Pa.Super. 4, 419 A.2d 631 (1980), and (3) an employee may not be fired for reporting violations of federal regulations to the Nuclear Regulatory Commission. *Field v. Philadelphia Electric Company*, 388 Pa.Super. 400, 565 A.2d 1170, 1180 (1989).

Federal courts interpreting Pennsylvania law have been slightly more expansive, allowing the exception to apply where an employer discharged an employee for refusing to take a polygraph test, *Perks v. Firestone Tire & Rubber Co.*, 611 F.2d 1363 (3d Cir. 1979), where an employee lost her job for filing a workers' compensation claim, *Rettinger v. American Can Co.*, 574 F.Supp. 306, 311 (M.D.Pa.1983) (Rambo, J.), where an employee was fired for reporting the illegal actions of her employer, *Paralegal v. Lawyer*, 783 F.Supp. 230 (E.D.Pa.1992), and where an employee is discharged for refusing to support the employer's lobbying efforts. *Novosel*, 721 F.2d at 900.

■ In the instant case, Defendant argues that Plaintiff's allegations, even when taken as true, do not implicate Pennsylvania

public policy. Defendant directs our attention to a number of cases that stand for the proposition that public policy is not violated when an employee is fired for refusing to lie during a company's internal investigation. It relies on *Rost v. Nat'l Railroad Passenger Corporation*, No. 88–6598, 1992 WL 220995 1992 U.S.Dist.LEXIS 13130 (E.D.Pa. Aug. 31, 1992). In *Rost*, the plaintiffs claimed that they were discharged for refusing to lie during an internal Amtrak investigation. The court held that:

Being requested by an employer to lie to further an internal company investigation is indeed disturbing, but does not amount to a public policy violation that will support a wrongful discharge claim.

*Id.* at *8, 1992 U.S.Dist.LEXIS 13130 at *21. In offering *Rost*, Defendant ignores a clear distinction. In the case at bar, Plaintiff alleges that he was terminated for refusing to give false statements to federal investigators. While there is no law requiring veracity in internal investigations of private companies, there is such a statute in the context of a federal investigation. *See* 18 U.S.C. § 1001 (1993).[1] In response to Plaintiff's invocation of the federal statute, Defendant suggests that:

[f]irst, as a legal matter, any purported violation of 18 U.S.C. § 1001 simply would not violate the public policy of Pennsylvania so as to allow Hanson to state a claim for wrongful discharge.

Defendant's Reply Brief at 10. The implication is that Pennsylvania regards only its own legislation as stating public policy within the Commonwealth. This argument is without merit. First, federalism is not a doctrine requiring the federal government to respect state autonomy yet imposing no duty upon the states. Citizens of Pennsylvania are citizens of the United States and, certainly, adherence to federal law is in their best interests. Second, there is authority from

---

1. That statute proclaims that:

[w]hoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious, or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

the Pennsylvania Superior Court that unambiguously belies Defendant's contention.

> Under the [Energy Reorganization Act], Field was required statutorily to report these violations. Thus appellants were fired because Field performed a duty he was required to perform under *federal* law.

*Field,* 565 A.2d at 1180, 1182 (finding a wrongful discharge claim where employees claimed they were fired because one of them reported violations of federal regulations) (emphasis added). Clearly, Pennsylvania courts allow that federal law may state public policy cognizable in Pennsylvania common law.

■ Defendant also argues that, because the public policy exception is a narrow one, we should not recognize new causes of action without clear direction from the Pennsylvania Supreme Court. We agree that the exception is narrow and that state law is best interpreted and expanded by state courts. However, a federal court sitting in diversity, without guidance from the state's highest court, is to predict what that court would do. *Commissioner v. Estate of Bosch,* 387 U.S. 456, 465, 87 S.Ct. 1776, 1782, 18 L.Ed.2d 886 (1967); *Woodson v. AMF Leisureland Centers, Inc.,* 842 F.2d 699, 702 (3d Cir.1988). We believe Pennsylvania precedent is consistent and that we can discern the doctrinal trend in this area, and that our recognition of an exception in the instant case would not offend the authority of the Pennsylvania Supreme Court to interpret state law.[2]

This case resembles those cases in which the Pennsylvania courts have allowed causes of action. For example, in *Reuther,* 386 A.2d 119, the Superior Court concluded that serving on juries is of the "highest importance to our legal process." *Id.* at 120. In the same sense, the ability of federal investigators to glean truthful statements from citizens "strikes at the heart of a citizen's social rights, duties and responsibilities." *Turner,* 505 A.2d at 261. We conclude that the Pennsylvania Supreme Court would consider the allegations of the instant complaint to fall with the narrow exception recognized in *Geary.* 319 A.2d 174. An employee may bring a cause of action in Pennsylvania for wrongful discharge when he is fired for refusing to give false information to federal investigators.

### C. Factual Dispute

■ Defendant argues that there is no factual dispute regarding whether Atwood requested that he give false information to the GAO investigators if they questioned him. Defendant points to Plaintiff's deposition testimony and characterizes it as retracting his allegation that he was fired for refusing to lie. Defendant's interpretation of the deposition testimony is puzzling. Defendant argues that "Hanson admitted that at no time did Atwood tell him to perjure himself, lie, give false testimony, make a false statement under oath, or sign a false affidavit." Defendant's Brief in Support at 15. This statement is true, taken literally. Examination of the deposition suggests that such a literal interpretation does not accurately reflect the nature of the testimony.

> Q Okay. I take it then that at no time did Mr. Atwood actually use the words perjure or lie, that you should lie about Mr. Cline?
>
> A No, he didn't use those words.
>
> Q Okay. Or give false testimony. He did not use the words false testimony?
>
> A He did not use those words.
>
> Q And he did not ask you to take an oath and commit a false statement under oath, did he?
>
> A He did not use those words.

Deposition of Andrew S. Hanson at 100–01. The only reasonable inference to draw from this testimony is that Atwood did not use certain words in his conversation with Plaintiff. That hardly leads to the conclusion that Atwood did not ask in some other way for Plaintiff to lie to investigators.[3] Thus, there

---

2. We note the irony in Defendant's having removed this case from a state court and then arguing that we should not recognize a new area of state law because we are a federal court.

3. Defendant suggests in its principal brief that Gichner was never actually the target of a federal investigation. However, Defendant does note that two employees were investigated by federal agents. One of those employees is the man

remains a dispute as to whether Atwood asked Plaintiff to give an inaccurate statement and fired him for refusing.[4]

### D. *Causal Connection*

■ Although Defendant does not refer to it, there is an important consideration raised in the evidence. While there is a factual dispute regarding whether Atwood told Hanson to lie to federal investigators, there is evidence in the record clearly indicating that even if that conversation did take place, it did not cause Plaintiff's termination.

Hanson's direct supervisor, Joseph Digirolamo, states in a sworn declaration that:

6. Dennis Thompson, the Director of Personnel, and I told Hanson that he was terminated. Andrew Hanson was terminated in July, 1991, for legitimate performance-related reasons only. I initiated the decision to terminate Mr. Hanson. At no time prior to or after Mr. Hanson's termination did Mr. Hanson ever mention that Charles Atwood had asked him to make false representations concerning any current or former employee of Gichner.

7. At no time did Charles Atwood ever indicate to me in any way that Andrew Hanson should be terminated because he refused to make false representations concerning any current or former employee of Gichner.

Declaration of Joseph Digirolamo. In response, Plaintiff points to his own declaration, filed concurrently with his brief opposing the current motion.

8. Thereafter, approximately one month later in July of 1991, Mr. Digirolamo informed me that I was terminated. He also told me that he fought the termination and it could have been avoided if "I didn't go against Chuck [Charles Atwood]."

Declaration of Andrew S. Hanson. Plaintiff suggests that we infer from this that "going against Chuck" meant refusing to lie to investigators. We believe the phrase, assuming it was actually said, is subject to different interpretation. As we will discuss, Plaintiff was accused of refusing Charles Atwood's legitimate instruction regarding numbers on a proposal. Hence, Plaintiff's declaration is ambiguous, while Digirolamo clearly indicated that there was no link between the alleged request to lie and the termination.

### E. *Independent Grounds*

■ Ignoring, for the moment, the causation question, the inquiry does not end with the determination that Plaintiff has stated a sufficient public policy reason. Even where the discharge may have been motivated by a consideration offensive to public policy, an employer may freely discharge an employee if there is a separate, legitimate reason for doing so. *Field*, 565 A.2d at 1182; *see also*, *Borse v. Pierce Goods Shop, Inc.*, 963 F.2d 611, 616–17 (3d Cir.1992).

Defendant offers four allegedly independent grounds. Because the legitimacy of any of them would mandate that we grant summary judgment in favor of Defendant, we need find only one with support in the record.

■ Defendant places greatest emphasis on its first ground, that Plaintiff prepared a proposal with inflated costs and refused to change it even when so instructed by Gichner's president, Charles Atwood. Defendant points to Plaintiff's deposition as evidence that this problem occurred. We do not read

Plaintiff claims Atwood asked him to lie about. Hence, by Defendant's admission, there was an investigation and it is logical to presume that investigators might have chosen to speak with Hanson.

**4.** To his brief in opposition to the current motion, Plaintiff has attached a declaration directed to the factual issues presented in this case. Defendant characterizes that declaration as bordering on "wholesale perjury" because it "flatly contradicts his prior deposition testimony." Defendant's Reply Brief at 3. As we have indicated, Defendant has misconstrued Plaintiff's deposi-

tion testimony. Thus, the declaration does not contradict the deposition; rather, it seems merely to clarify some points confused by Defendant.

We further note Defendant's argument that the public policy reason underlying Plaintiff's suit is rendered moot because government investigators never actually questioned Plaintiff. We do not agree. The public policy is both in preventing people from lying to federal agents and in preventing employers from pressuring employees to lie. Given the latter consideration, it is of little moment that investigators did not actually speak with Hanson.

the deposition to support Defendant's point; it is inconclusive. However, the Digirolamo declaration offers stronger support.

[5.] ... In June, 1991, there was a serious problem involving Hanson's inclusion of engineering costs for a padlock in a bid on shelter system units for TATERS. At a bid review meeting for TATERS in June, 1991, Charles Atwood, the President and CEO of Gichner, instructed Hanson to change the proposal and to avoid any "padding" of the costs.

4. On or about July 12, 1991, there was another bid review meeting for TATERS. It became apparent that Hanson had not changed the improper proposal. On the very day that it became apparent that Hanson had refused to change the improper cost estimates on the bid, I prepared a memorandum recommending that Hanson be terminated immediately.

Digirolamo Declaration. In response, Plaintiff offers his declaration, claiming that:

13. There was only one bid review meeting and that occurred in June of 1991. Atwood never instructed me to change the proposal. I never had any authority to change any cost estimate on the proposal.

Hanson Declaration. Hence, there is directly conflicting sworn testimony about this factual issue, making it an improper ground for summary judgment.[5]

█ Defendant's second asserted independent ground for terminating Plaintiff is that Plaintiff's annual reviews indicated that he was a substandard employee. The only record evidence is Plaintiff's deposition and, as before, it does not support Defendant's contention.

Q Okay. Now, you received annual reviews at the company; correct?

A Some annual reviews. That didn't start until my later years there.

Q 1989?

A That sounds about right.

Q Okay. And would you agree that your reviews were mixed, in that you were given credit for some strong points and you were also noted to have some shortcomings?

A Some areas for improvement, as in all reviews.

Q Okay. And those were discussed with you, correct, these areas of improvement? I don't mean to take away from the fact that you also got favorable comments, but the shortcomings or the areas of improvement were discussed?

A Sure, sure.

\* \* \* \* \* \*

Q Okay, and there's a scoring that was used in these evaluations; correct?

A I see that from the document you have given to me, yes.

\* \* \* \* \* \*

Q Now, do you have any knowledge as to how your overall score of 26 points would place you relative to other employees?

A I think the other employees' rating points were confidential to them, so I would have no way of knowing.

Q I don't mean to suggest that you did, I just wondered if you did know.

Did you know what an average score was, a high score or a low score? Do you have any recollection of that?

A Since mine was the only score I got to see, then I had no way to judge it against others.

Hanson Depo. at 122–23, 126–27. This testimony does not support the argument that Plaintiff received performance reviews indicating that he was a substandard employee. Presumably, most employees receive both good and bad comments on their reviews. Defendant has not offered any other scores or any average score that might indicate that Plaintiff's scores were low. In short, we are left with Plaintiff's testimony that his reviews included some criticism.

█ Defendant also points to Plaintiff's deposition as proof that he did not associate well with his colleagues while he worked at Gichner.

---

5. Additionally, we note that there is some question in the record about whether Digirolamo was present at the June bid review meeting. If he were not, his declaration would not be from personal knowledge.

Q You were aware there were certain people at least in the company that thought you were hard to work with?

A I suppose so.

Hanson Depo. at 128–29.

More enlightening, however, is the Digirolamo declaration. There, the supervisor testifies that an attached memorandum accurately recites his reasons for terminating Hanson. That memorandum includes assertions such as the following:

> Pertaining to the TATERS proposal activity, several departments, specifically Engineering have indicated that he was extremely difficult to work with. They say he is arrogant and does not assist them in resolving their issues. He tends to hand off requirements that are in general his responsibility. The bottom-line is that most departments do not believe you are a team player. Historically, Andy, over the last three years I have heard nothing but complaints about his manner of handling problems/issues, his arrogance and lack of attention to details.

Memorandum to File by Joseph Digirolamo of 7/12/91. The memorandum then enumerates five specific instances, including Hanson's arguments with supervisors and inability to work with his colleagues effectively. Plaintiff offers no record evidence to contradict these statements.

Therefore, we are left with Defendant's undisputed evidence that there was a separate, legitimate ground for Plaintiff's discharge, namely his inability to work with his co-workers. There being no factual dispute, we must find that Defendant has enunciated a proper independent basis for terminating Plaintiff's employment. That, coupled with the evidence that there is no link between any request that Plaintiff lie and his dismissal, renders summary judgment appropriate.

We will issue an order granting judgment.

### *ORDER AND JUDGMENT*

AND NOW, this 18th day of August, 1993, upon consideration of Defendant's motion for summary judgment and Plaintiff's motion to file a sur reply brief, it is ordered that:

1. Defendant's motion is granted and judgment is entered in favor of Defendant and against Plaintiff.

2. Plaintiff's motion is denied.

3. The Clerk of Court shall close the file.