[No. 22424-1-II.   Division Two.   May 7, 1999.]

DIANE LINS, ET AL., *Appellants*, v. CHILDREN'S DISCOVERY CENTERS OF AMERICA, INC., *Respondent*.

*Gregory E. Price*, for appellants.

*Brownstein, Rask, Arenz, Sweeney, Kerr & Grim, L.L.P.* (*Lynda J. Hartzell*, of counsel), for respondent.

MORGAN, J. — Diane Lins sued her employer for wrongful discharge. The trial court dismissed her suit on summary judgment. Taking the evidence and reasonable inferences in the light most favorable to Lins,[1] we reverse and remand for trial.

Children's Discovery Centers of America, Inc. (CDC) operates a number of child care centers. In March 1995, it employed Pam French as its operations director for the West Coast. One of French's subordinates was Diane Lins, a regional director in charge of six child care centers in the Portland/Vancouver area. French had authority to direct, evaluate, and fire Lins.

Before the events in issue here, CDC promoted Lins and gave her good performance ratings. It did not put her on probation or assert that she was performing deficiently.

---

[1]*Young v. Key Pharms., Inc.*, 112 Wn.2d 216, 225-26, 770 P.2d 182 (1989).

On March 8, 1995, Lins and five other CDC employees were injured in an auto accident that occurred in the course and scope of their employment for CDC. Lins later referred to the other five as "directors" because each of the five was the director of a particular child care center. Each of those injured, including Lins, filed a workers' compensation claim with the Washington Department of Labor and Industries.

A week or two after the accident, French ordered Lins to fire the other five employees no later than May 1, 1995. French had heard that two of them were consulting attorneys and "contemplating suing CDC";[2] she "didn't trust either of them not to sue the company, and she was not going to allow that to happen."[3] She harbored similar feelings about the remaining three, even though they had not yet seen attorneys. According to Lins' deposition testimony:

Q: So after the employees filed their insurance claims for their injuries, did [French] . . . have a continuing concern that there would be ongoing litigation?

A: At that point she felt that, because they had considered it, that they couldn't be trustworthy employees; and that she felt that they had crossed what she considered the loyalty line; and that there was no return for them.

Q: And the only two people that had discussed calling an attorney were Julie and Patty, correct?

A: That I know of, at that time.

Q: So that didn't include Angie or Kari or Shelley?

A: Right.

Q: And so why would there be concerns about letting them go, that were expressed to you, in your own opinion?

A: When I met with Pam in California, it was approximately

---

[2] Clerk's Papers at 102 (Affidavit of Lins). Although French "later realized that employees could not independently bring suit against their employer, but had to file worker compensation claims," she later told Lins "that they should be fired because their intent showed disloyalty." Clerk's Papers at 34 (Deposition of Lins).

[3] Clerk's Papers at 34 (Deposition of Lins).

two weeks after the accident, if not sooner, she had said that, in the best interest of the company, to avoid any more problems over the car accident, that we would need to dismiss all the directors involved because she just felt it was best for the company.

She didn't want directors talking about it. She wanted it to be a non-existent fact on her record. And in order to do that, we had to get rid of the directors.[4]

Lins could not lawfully have carried out French's order. RCW 51.48.025 declares, "No employer may discharge or in any manner discriminate against any employee because such employee has filed or communicated to the employer an intent to file a claim for compensation or exercises any rights provided under [Title 51 RCW]."[5]

Realizing she could not lawfully perform French's order, Lins refused to do so. She later explained:

I knew that they and I had legal rights to claims under the worker compensation statute. To fire them would send a clear message that they should not have exercised their legal rights, and I knew it would be illegal for me to take such action.[6]

On May 5, 1995, French gave Lins her first poor performance review and put her on probation. Effective June 22, 1995, French fired Lins for "Neglect of Duties/Poor Performance."[7] French did not fire the other five employees, but four of them later left CDC.

On December 11, 1996, Lins sued CDC. She alleged that she had been wrongfully discharged "in violation of the public policy of the state of Washington which mandates that an employee may not be terminated for refusing to

---

[4]Clerk's Papers at 36.

[5]RCW 51.48.025(1).

[6]Clerk's Papers at 102-03.

[7]Clerk's Papers at 47.

perform an illegal act."[8] She further alleged that CDC knew or should have known about French's actions.

Six months later, CDC moved for summary judgment. It correctly pointed out that Lins was not claiming she had been fired for filing her own workers' compensation claim; rather, she was claiming that she had been fired for refusing to obey French's unlawful order. Although conceding that it could not lawfully fire an employee for filing a workers' compensation claim, it argued that it could lawfully fire an employee for refusing to obey an unlawful order to fire other employees because the others had filed such claims. The trial court granted the motion and dismissed the case.

The issue on appeal is whether public policy prevents an employer from retaliating for an employee's refusal to carry out the employer's clearly unlawful order. We hold that it does, at least under the circumstances present here.

■ Subject to many exceptions, an employer may discharge an employee at will.[9] The exceptions pertinent here arise from public policy.[10]

Public policy prohibits an employer from considering certain characteristics when deciding whether to discharge an employee. Thus, it is unlawful for an employer to discharge an employee "because of age, sex, marital status, race, creed, color, national origin, or the presence of any sensory, mental, or physical disability . . . ."[11] It is also unlawful for an employer to discharge because an employee has tested positive for HIV "unless the absence of HIV

---

[8]Clerk's Papers at 4 (Amended Complaint).

[9]*Gardner v. Loomis Armored, Inc.*, 128 Wn.2d 931, 935, 913 P.2d 377 (1996); *Dicomes v. State*, 113 Wn.2d 612, 617, 782 P.2d 1002 (1989); *Roberts v. ARCO*, 88 Wn.2d 887, 891, 568 P.2d 764 (1977).

[10]Exceptions may also arise from contract, but we are not concerned with those here. *See Riccobono v. Pierce County*, 92 Wn. App. 254, 263, 966 P.2d 327 (1998).

[11]RCW 49.60.180(2).

infection is a bona fide occupational qualification for the job in question."[12]

Public policy also prohibits an employer from considering certain activities when deciding whether to discharge an employee. Thus, it is unlawful for an employer to discharge an employee because the employee refuses to do an illegal act,[13] or performs a public duty or obligation such as serving on a jury[14] or saving another citizen's life.[15] It is unlawful for an employer to discharge an employee because the employee exercises a legal right or privilege, such as filing a worker's compensation claim under RCW 51;[16] filing a discrimination complaint under RCW 49.60;[17] filing a whistleblower complaint under RCW 42.40;[18] filing a complaint under the Washington Industrial Safety and Health Act (WISHA), RCW 49.17;[19] filing a community-right-to-know complaint under RCW 49.70;[20] reporting nursing home abuse under RCW 70.124;[21] filing a farm-labor claim under RCW 19.30;[22] filing a minimum wage claim under RCW 49.46;[23] filing a family-leave claim under RCW 49.78;[24] or engaging in collective bargaining activities under RCW

[12] RCW 49.60.172(2).

[13] *Gardner,* 128 Wn.2d at 936; *Dicomes,* 113 Wn.2d at 618; *Thompson v. St. Regis Paper Co.,* 102 Wn.2d 219, 233, 685 P.2d 1081 (1984).

[14] *Nees v. Hocks,* 272 Or. 210, 536 P.2d 512 (1975), *cited in Dicomes,* 113 Wn.2d at 618.

[15] *Gardner,* 128 Wn.2d 931.

[16] RCW 51.48.025; *Warnek v. ABB Combustion Eng'g Servs., Inc.,* 137 Wn.2d 450, 456, 972 P.2d 453 (1999); *Wilmot v. Kaiser Aluminum & Chem. Corp.,* 118 Wn.2d 46, 821 P.2d 18 (1991).

[17] RCW 49.60.210(1).

[18] RCW 49.60.210(2).

[19] RCW 49.17.160.

[20] RCW 49.70.110.

[21] RCW 70.124.060.

[22] RCW 19.30.190.

[23] RCW 49.46.100(2).

[24] RCW 49.78.130.

49.32.020.[25] It is unlawful for an employer to discharge an employee because of certain garnishments[26] and wage assignments.[27] These and similar provisions are often summarized by saying that it is unlawful for an employer to "retaliate" against an employee for "protected activity."

■ The problem, of course, is defining the "activity" that public policy "protects." Either the legislature or the judiciary may address that problem, the legislature through statutes and the judiciary through decisional law. When the judiciary addresses the problem, it inquires (1) whether a clear public policy exists;[28] (2) whether that policy will be jeopardized unless the activity in issue is protected;[29] (3) whether employers in general have "overriding justification" for wanting to use the activity in issue as a factor affecting the decision to discharge;[30] and (4) whether the particular employee's activity in the case at bar was a substantial factor in (i.e., a cause of) the particular employer's decision to discharge.[31] Always, however, the judiciary

[25]*Bravo v. Dolsen Cos.*, 125 Wn.2d 745, 757-58, 888 P.2d 147 (1995); RCW 49.32.020.

[26]RCW 6.27.170.

[27]RCW 9.94A.2005(7); RCW 26.18.110(8); RCW 26.23.080; RCW 74.20A.230.

[28]*Gardner*, 128 Wn.2d at 941.

[29]*Gardner*, 128 Wn.2d at 941. *Gardner* actually states, "The plaintiffs must prove that discouraging the conduct in which they engaged would jeopardize the public policy." This language works when the employee's conduct is an act of commission, such as Gardner's running to the aid of a woman held hostage. It does not work when the employee's conduct is an omission, such as refusing to fire a worker for filing a workers' compensation claim. Without intending to change its meaning, we have reworded it to accommodate omission as well as commission.

[30]*Gardner*, 128 Wn.2d at 941, 947-49. This was the fourth element in *Gardner*, but we have made it the third here. *Gardner*'s first, second and fourth elements (our first three elements) are similar because each involves a legislative fact. *Gardner*'s third element is different because it involves an adjudicative fact. We think clarity is enhanced by putting together those that are similar, and putting last the one that is different. For the distinction between legislative and adjudicative facts, see *Wyman v. Wallace*, 94 Wn.2d 99, 615 P.2d 452 (1980), and Advisory Committee's Note to FRE 201, 56 F.R.D. 183, 201-04.

[31]*Gardner*, 128 Wn.2d at 941; *Allison v. Housing Auth.*, 118 Wn.2d 79, 95, 821 P.2d 34 (1991); *Wilmot*, 118 Wn.2d at 71-72. This was the third element in *Gardner*, but we have made it the fourth here. See the preceding footnote.

should be slow to protect activity not previously protected; as the Supreme Court has said, "[C]ourts should proceed cautiously if called upon to declare public policy absent some prior legislative or judicial expression on the subject."[32]

Turning to the first of the four elements just identified, we hold that Washington has a clear public policy against firing an employee because he or she has filed a workers' compensation claim. As already seen, the legislature declared in RCW 51.48.025 that "no employer may discharge or in any manner discriminate against any employee because such employee has filed or communicated to the employer an intent to file a claim for compensation or exercises any rights provided under [Title 51 RCW]."[33] Similarly, the Supreme court declared in *Wilmot v. Kaiser*:

> Even without RCW 51.48.025, we would acknowledge existence of a clear mandate of public policy against retaliatory discharge of employees for pursuing workers's compensation benefits and allow a tort cause of action for wrongful discharge, as have a number of other jurisdictions.[34]

Turning to the second element, we hold that the policy just described will be jeopardized if, without incurring liability, an employer can fire an employee for refusing to carry out a clearly unlawful order. If the employee's refusal is not protected from retaliation, the employee will likely perform the order to save his or her job; the employer will have a readily available means by which to implement its unlawful order; and the policy stated by the legislature and Supreme Court will be impaired or destroyed. But if the employee's refusal is protected, the employee will be likely

---

[32]*Gardner,* 128 Wn.2d at 936; *Dicomes,* 113 Wn.2d at 617; *Thompson,* 102 Wn.2d at 232; *see also Schonauer v. DCR Entertainment,* 79 Wn. App. 808, 827, 905 P.2d 392 (1995).

[33]RCW 51.48.025(1).

[34]*Wilmot v. Kaiser Aluminum & Chem. Corp.,* 118 Wn.2d 46, 54, 821 P.2d 18 (1991).

to refuse the order; the employer will be denied a readily available means by which to implement the order; and the policy stated by the legislature and Supreme Court will be served.

Turning to the third element, we hold that employers do not have any "overriding justification" for wanting to consider an employee's refusal to perform an unlawful order when deciding whether to fire the employee. By virtue of the order being unlawful in the first instance, the employer should not have given it, and the employer has no legitimate interest in having it carried out.

Finally, on the fourth element, a jury could reasonably infer from the evidence in this record that Lins' refusal to carry out French's unlawful order was a substantial factor in Lins' being fired. We conclude that Lins' refusal to carry out French's order was conduct protected by public policy, that French's retaliation was unlawful, and that Lins has presented evidence sufficient to go to a jury.

CDC claims that *Gardner v. Loomis*, the case from which we take the above analysis, has no bearing here; that the court in *Dicomes v. State* was establishing four separate torts when it set forth four general areas in which a discharge may violate public policy;[35] and that an act cannot be "illegal" for purposes of a public policy wrongful discharge claim unless it is criminal. Rejecting these arguments, we hold that *Gardner v. Loomis* obviously governs this case; that the *Dicomes* court was merely grouping cases for convenience of analysis; and that an act need not be criminal in order to be significant for purposes of a public policy wrongful discharge claim.

---

[35]*Gardner v. Loomis Armored, Inc.*, 128 Wn.2d 931, 913 P.2d 377 (1996); *Dicomes v. State*, 113 Wn.2d 612, 782 P.2d 1002 (1989). At 113 Wn.2d 618, the *Dicomes* court said, "Courts have found contravention of a clear mandate of public policy in four general areas: (1) where the discharge was the result of refusing to commit an illegal act; (2) where the discharge resulted due to the employee performing a public duty or obligation; (3) where the termination resulted because the employee exercised a legal right or privilege; and (4) where the discharge was premised on employee 'whistleblowing' activity [citations omitted]."

Reversed and remanded for further proceedings.

ARMSTRONG, A.C.J., and HUNT, J., concur.