Theodore C. ROTHROCK and Douglas
Rothrock, Appellees,

v.

ROTHROCK MOTOR SALES,
INC., Appellant.

Superior Court of Pennsylvania.

Argued March 12, 2002.

Filed Sept. 25, 2002.

Reargument Denied Dec. 4, 2002.

Carl D. Buchholz, Philadelphia, for appellant.

Daniel S. Weinstock, Philadelphia, for appellees.

Before: KLEIN, BOWES AND BROSKY, JJ.

OPINION BY BOWES, J.:

¶ 1 Rothrock Motor Sales, Inc. appeals from the judgment entered after a jury awarded Theodore Rothrock $192,000 in compensatory damages in this wrongful discharge action. The main issue presented is whether a wrongful discharge action is permitted in Pennsylvania when an employee is fired for refusing to dissuade a subordinate employee from pursuing a workers' compensation claim. We conclude that such a cause of action exists and affirm.

¶ 2 Appellees are Theodore Rothrock and Douglas Rothrock, father and son, respectively, who were at-will employees of Appellant. They instituted this action asserting that they both had been discharged in violation of the public policy of Pennsylvania. Bruce Rothrock, Theodore's brother, was the owner and president of Appellant. Theodore was the manager of the body shop and direct supervisor of Douglas, who worked as a painter in that department. In April 1992, Douglas injured himself and in May 1992, filed a claim for workers' compensation benefits alleging his injury was work-related. Appellees averred that they were both fired in July 1992 after Douglas refused to withdraw his workers' compensation claim.

¶ 3 Appellees presented the following evidence at trial. Theodore was aware that Douglas had reported a work-related injury to the personnel department sometime in April 1992, although he did not know that Douglas filed a claim in late May. In June 1992, a few weeks after Douglas filed his workers' compensation claim, Bruce summoned Theodore to his office and asked whether he knew that Douglas had filed a claim. Theodore responded in the negative. Bruce insisted that Douglas had not been injured at work, but that his physical problems were the result of a stock car accident that occurred some time prior to 1992.

¶ 4 Theodore testified that during that June 1992 meeting, "[Bruce] told me that ... I should go home and have Doug come in and sign a release [of] ... the company of any liability for his injuries that he had." N.T. Trial Vol. II, 9/6/00, at 31. Theodore further testified that Bruce said, "[I]f I didn't do this, not one would be gone, two would be gone. Meaning that if I didn't get it done, not one fired, two are fired." *Id.* at 33. Theodore went home that day and relayed to Douglas Bruce's threat to fire them both. Douglas initially told Theodore that he was willing to sign the release in order to save Theodore's job, but he subsequently decided not to do so.

¶ 5 Theodore then was summoned to a July 16, 1992 meeting with Bruce, Bruce Jr., who is Bruce's son, Douglas, and Douglas's wife. Theodore testified that at the meeting, "[Bruce] gave Doug a paper and he said Doug, I want this signed. And Doug ... said Uncle Bruce, I can't sign this paper." *Id.* at 37. An argument between Bruce and Douglas ensued. Theodore indicated that "the argument concluded with getting into a very heated session and my brother told my son, Doug, to get the 'f' out of the shop, you're fired." *Id.* at 39. At that point, Douglas and his wife

left. After they left, Bruce looked at Theodore and told him "remember what I told you." *Id.* at 40. Theodore understood that this meant that since Theodore had not gotten the release signed, he was fired. Theodore took his personal belongings and left the premises.

¶ 6 At trial, Douglas testified that in May 1989, he suffered a cut to his chin in a stock car accident. He never experienced any problems as a result of that accident and actually attended a company picnic the following day. At the end of April 1992, he suffered an injury to his neck when he picked up a computer while he was working. He reported his injury to the personnel coordinator on April 28, 1992, and then filed a workers' compensation claim at the end of May. Sometime in June 1992, Theodore informed Douglas that Douglas had to sign a release form for Appellant regarding the workers' compensation claim or "both me and him would be fired from the company." N.T. Trial Vol. III, 9/7/00, at 73. Douglas initially told Theodore that he would sign it in order to save Theodore's job. Theodore later counseled Douglas against signing it since Douglas should not be forced to sign the release in order to save Theodore's job. Ultimately, Douglas did not sign the release. *Id.* at 74. Douglas testified that at the meeting among the parties, Bruce said to Theodore, "Ted, do you remember what I said to you from the last meeting? It goes for now." *Id.* at 77. Douglas understood that to mean that he and his father were fired, and he left the premises.

¶ 7 In his testimony, Bruce denied that he threatened to fire Theodore and Douglas if the workers' compensation claim was not withdrawn. He professed that Theodore and Douglas voluntarily left their jobs in anger because Bruce questioned whether Douglas's injury was, in fact, work-related. In addition, Appellant presented evidence that even if Appellant had terminated Appellees, they were terminated for misconduct.

¶ 8 The parties stipulated that Douglas prevailed on his workers' compensation claim. In addition, Theodore successfully collected unemployment benefits in an action that was contested by Appellant. During that proceeding, Appellant produced two warning slips purportedly signed by Theodore before the employment relationship was terminated. At that time, Theodore denied seeing or signing the slips before. At trial in this matter, Theodore was permitted to introduce those slips as well as the testimony of a handwriting expert witness, who opined that Theodore's signatures on the slips were forged.

¶ 9 In response to special interrogatories, the jury determined that Appellant had not terminated Douglas's employment. The jury also found that Theodore was terminated because Douglas refused to abandon his workers' compensation claim. The jury awarded Theodore $192,000 in compensatory damages, but declined to award punitive damages. This appeal followed the denial of post-trial motions and entry of judgment on the verdict.

¶ 10 Appellant initially contends that it is entitled to judgment notwithstanding the verdict because Theodore, as an employee at will, does not have a cause of action for wrongful discharge. In this case of first impression, we must decide whether a cause of action exists when an employee is discharged for refusing to interfere with a subordinate's pursuit of a workers' compensation claim. In making this decision, we are bound by the jury's determination that Theodore, in fact, was fired in retaliation for his refusal to persuade Douglas, his subordinate, to withdraw his workers' compensation claim.

¶ 11 At the outset, we acknowledge that the employment-at-will doctrine has deep roots in the history of this Commonwealth. "Generally, an employer 'may discharge an employee with or without cause, at pleasure, unless restrained by some contract.' *Henry v. Pittsburgh & Lake Erie Railroad Company,* 139 Pa. 289, 297, 21 A. 157 (1891)." *Shick v. Shirey,* 552 Pa. 590, 595, 716 A.2d 1231, 1233 (1998); *accord McLaughlin v. Gastrointestinal Specialists, Inc.,* 561 Pa. 307, 750 A.2d 283 (2000) (Pennsylvania courts have recognized for over a century that an employer may terminate an employee for any reason absent contractual provision to the contrary). In this jurisdiction, "the law has taken for granted the power of either party to terminate an employment relationship for any or no reason." *Shick, supra* at 595, 716 A.2d at 1233 (quoting *Geary v. United States Steel Corp.,* 456 Pa. 171, 175, 319 A.2d 174, 176 (1974)); *see also Paul v. Lankenau Hospital,* 524 Pa. 90, 569 A.2d 346 (1990). Courts are reluctant to allow exclusions to the employment-at-will doctrine; exceptions are recognized only in narrowly-confined circumstances where a clear public policy is implicated.

¶ 12 Our Supreme Court eloquently has reviewed the principles that define the powers and responsibilities of the legislature and judiciary with regard to public policy considerations. It has observed that while the legislature has the authority to enact public policy as a matter of expediency, when the courts declare public policy, "it must, and may only, be a reliance upon the consistency with sound policy and good morals as to the consideration or thing to be done." *Shick, supra* at 601, 716 A.2d at 1236 (quoting *Mamlin v. Genoe,* 340 Pa. 320, 325, 17 A.2d 407, 409 (1941)). The Court has stated:

It is only when a given policy is so obviously for or against the public health, safety, morals or welfare that there is a virtual unanimity of opinion in regard to it, that a court may constitute itself the voice of the community in so declaring. There must be a positive, well-defined, universal public sentiment, deeply integrated in the customs and beliefs of the people and in their conviction of what is just and right and in the interests of the public weal.

*Id.* at 600, 716 A.2d at 1235–36 (quoting *Mamlin, supra* at 325, 17 A.2d at 409). As Judge Beck noted in her concurring opinion in *Hunger v. Grand Central Sanitation,* 447 Pa.Super. 575, 670 A.2d 173 (1996), a public policy is one that strikes at the heart of a citizen's social right, duties, or responsibilities and will be found only where the policy has been reduced to a legislative mandate reflected in constitution, statute, or regulatory provision.

¶ 13 As directed by our Supreme Court, we must be ever wary of entering into the nebulous area of judicially-created public policy when confronted with a request to expand an existing cause of action. The judiciary should grant such a request only when there is a positive, well-defined, universal public sentiment, deeply integrated in the beliefs of the people and in their conviction of what is just and right and in the interests of the common good.

¶ 14 If we accept Appellant's argument that Appellee does not have a cause of action for wrongful discharge, our decision would, in effect, allow employers to engage in prohibited conduct through their supervisory employees. Consequently, we are inclined to carve out an exception to the employment-at-will doctrine to deter such behavior. This exception is warranted by the public policy embodied in the Workers'

Compensation Act (the "Act")[1] and prevailing Supreme Court precedent.

¶ 15 Public policy exceptions to the at-will employment doctrine, while rare, exist nonetheless. Our courts have permitted employees to proceed with wrongful discharge cases when public policy concerns are clear.[2] *See Highhouse v. Avery Transportation,* 443 Pa.Super. 120, 660 A.2d 1374 (1995) (employee was discharged for filing an unemployment compensation claim); *Raykovitz v. K Mart Corp.,* 445 Pa.Super. 378, 665 A.2d 833 (1995) (same); *Kroen v. Bedway Security Agency,* 430 Pa.Super. 83, 633 A.2d 628 (1993) (employee was discharged for refusing to submit to a polygraph test as a condition of his employment); *Field v. Philadelphia Electric Co.,* 388 Pa.Super. 400, 565 A.2d 1170 (1989) (employee was discharged for performing his statutory duty to report violations involving nuclear materials); *Reuther v. Fowler & Williams, Inc.,* 255 Pa.Super. 28, 386 A.2d 119 (1978) (employee was discharged for serving on jury, which is required by law).

¶ 16 In the present case, we are guided by our Supreme Court's decision in *Shick, supra,* which identifies the public policy implicated in this case. Therein, the Court, firmly relying upon the legislative pronouncements embodied in the Act, held that "The Workers' Compensation Act does provide a basis for . . . finding that termination of an at-will employee for filing a workers' compensation claim violates public policy." *Shick, supra* at 603, 716 A.2d at 1237. In examining the historical underpinnings of the Act, the Court observed that the Act is the sole means for an employee to obtain compensation for

injuries and a substitute for common law tort actions. Under the Act, an employee has no recourse against his employer for injuries sustained during the course of employment, even when those injuries are caused by the negligence of a fellow employee. In exchange, the employee may obtain workers' compensation benefits under a no-fault system. The exclusivity of the statutory remedy is the historical *quid pro quo* that employers receive in return for being subjected to a no-fault system of compensation for an employee's injuries. In sum, an employer is immune from tort liability while an employee can receive benefits in the absence of fault for a work-related injury. The *Shick* Court determined that the "historical balance would be disrupted if the employer could terminate an employee for filing a workers' compensation claim." *Id.* This balance would be disrupted, reasoned the court, since employees will not file claims for compensation if they can be fired, relieving the employer of its obligations under the Act.

¶ 17 By judicial decision, grounded in shielding the historical efficacy of a legislative pronouncement, our Supreme Court has determined that an employer may not discharge an employee for exercising his right to obtain workers' compensation benefits. The Court observed that if this action were allowed, an employee would not exercise his statutory right.

¶ 18 The question presented in this case is whether the same public policy implicated in *Shick* is violated when an employer fires a supervisory employee because he has refused to engage in conduct prohibit-

---

1. 77 P.S. §§ 1, *et seq.*

2. Pennsylvania enjoys the company of approximately forty-two other states that emphasize the importance of protecting employees from wrongful discharge by utilizing public policy concerns in adjudicating such cases. *See* Charles J. Muhl, *The Employment-at-will Doctrine: Three Major Exceptions,* 124 Monthly Lab.Rev. 3, 4–5 (Jan. 2001).

ed by that public policy. The answer must be in the affirmative.

¶ 19 If we were to allow an employer to fire with impunity a supervisor who refuses to interfere with the statutory right to obtain workers' compensation benefits, an employer could insulate itself from liability for the same violation of the aforementioned public policy. The supervisor would be forced to interfere with the employee's exercise of that right in order to save his job. It is repugnant to that same public policy and anathema to the historical balance inherent in the workers' compensation law to allow an employer to evade public policy by firing someone else who refuses to engage in what has been determined to be an unlawful act.

¶ 20 In *Lins v. Children's Discovery Centers of America, Inc.*, 95 Wash.App. 486, 976 P.2d 168 (1999), the Court of Appeals of Washington addressed the same issue presented in this case. The plaintiff, a supervisory employee of the defendant, was ordered to fire several subordinate employees for disloyalty because they were contemplating filing workers' compensation claims for injuries sustained during the course of their employment. In Washington, as in Pennsylvania, it is against public policy for an employer to discharge an employee for filing a workers' compensation claim. When the supervisory employee refused to interfere with her subordinates' exercise of their right to file workers' compensation claims, the supervisor was fired. The Washington Court of Appeals allowed recovery. In so doing, the Court employed a sound test that has application herein:

> When the judiciary addresses the problem [presented in this case], it inquires (1) whether a clear public policy exists; (2) whether that policy will be jeopardized unless the activity in issue is protected; (3) whether employers in gener-

al have "overriding justification" for wanting to use the activity in issue as a factor affecting the decision to discharge; and (4) whether the particular employee's activity in the case at bar was a substantial factor in (*i.e.*, a cause of) the particular employer's decision to discharge. Always, however, the judiciary should be slow to protect activity not previously protected; as the Supreme Court has said, Courts should proceed cautiously if called upon to declare public policy absent some prior legislative or judicial expression on the subject.

*Id.* at 492–93, 976 P.2d at 173 (footnotes omitted).

¶ 21 Turning to the first element, Pennsylvania, as articulated by judicial precedent, has recognized a clear public policy against firing an employee because he filed a workers' compensation claim. As to the second part of the test, it is evident that the announced public policy would be jeopardized if, insulating itself from liability, an employer could fire an employee for refusing to implement an unlawful directive. We believe, as did the Washington Court of Appeals, that if the employee's refusal to commit the proscribed act, which in this case was to persuade his subordinate to withdraw his claim, is not actionable, the supervisory employee would perform the act to avoid losing his job, and the employer would have the means to execute his unlawful command. Thus, the public policy embodied in the Act and identified in *Shick, supra*, would be circumvented.

¶ 22 As to the third element, we adopt the view of the Washington Court of Appeals that employers do not have justification to consider an employee's refusal to perform an unlawful order when deciding whether to fire the employee. As noted by the Court, "By virtue of the order being unlawful in the first instance, the employer

should not have given it, and the employer has no legitimate interest in having it carried out." *Id.* at 494, 976 P.2d at 173. Mindful of the fact that this represents an exception to the general rule that this Court should give full deference to how an employer operates his business, we conclude that the discharge of an employee in these circumstances cannot serve any legitimate interest of the employer.

¶ 23 Finally, as to the existence of the final element in this case, the jury has spoken. It determined that Theodore's refusal to interfere with Douglas's exercise of his right to claim workers' compensation benefits was the reason Theodore was discharged. Hence, we will allow recovery in this case.

¶ 24 We now address two other claims raised by Appellant on appeal. First, Appellant requests a new trial, claiming that the trial court erred in failing to instruct the jury that Appellant was permitted to discharge its employees if it had a separate, plausible, and legitimate reason for doing so, regardless of whether an important public policy was threatened by the termination. That issue unquestionably was waived by Appellant's failure to include it in post-trial motions. Pa. R.Civ.P. 227.1(b)(2). Nowhere in post-trial motions or in the brief filed in support of those motions did Appellant object to the court's failure to so instruct the jury. Furthermore, Appellant failed to lodge this specific complaint when it objected to the instructions at trial. N.T. Trial Vol. V, 9/11/00, at 130–34.

¶ 25 Appellant also asks for a new trial on the basis that the trial court erred in admitting evidence about the forged warning slips. Appellant contends that any evidence, including factual evidence and the expert witness testimony, about the slips was irrelevant and prejudicial.

¶ 26 Initially, we note that the admission of evidence is within the sound discretion of the trial court. *Cruz v. Northeastern Hospital,* 801 A.2d 602 (Pa.Super.2002). In the present case, as noted, Appellant presented a twofold defense to these charges. It contended that Theodore and Douglas voluntarily left their employment. In the alternative, it argued that if it had fired Appellees, they were fired for cause. It specifically denied firing Appellees for a prohibited reason. Clearly, Appellant's fabrication of the warning slips was relevant, as this subterfuge had a tendency to establish that Appellant was creating evidence to support its position that it had cause to fire Theodore. In other words, fabrication of the warning slips showed that Appellant did not have a legitimate reason for terminating Theodore's employment and that it created false evidence in a desperate attempt to prove that it did. Thus, evidence of the fabrication, including expert testimony that Theodore's signatures were forged, was relevant and its prejudicial impact did not outweigh its probative value.

¶ 27 Judgment affirmed.

¶ 28 Judge BROSKY files a dissenting opinion.

## DISSENTING OPINION BY BROSKY, J.

¶ 1 After careful review, I am constrained to conclude that Appellant is entitled to judgment n.o.v. and, accordingly, I dissent.

¶ 2 Appellant contends that Ted does not have a valid cause of action against it for wrongful discharge, and that it is therefore entitled to judgment in its favor as a matter of law. This first argument requires a discussion of our Supreme Court's decision

in *Shick v. Shirey*, 552 Pa. 590, 716 A.2d 1231 (1998), which addressed an issue of first impression: "whether Pennsylvania law recognizes a common law cause of action for wrongful discharge of an at-will employee for filing a workers' compensation claim." *Id.*, 716 A.2d at 1232.[3]

¶ 3 In *Shick*, an employee filed suit against his former employer, alleging that the employer had wrongfully discharged him from his employment in retaliation for his filing of a workers' compensation claim. The employer filed preliminary objections in the nature of a demurrer, which the trial court sustained, and this Court affirmed on the basis that no existing statutory or case law existed to find the cause of action viable. On appeal, our Supreme Court noted the general rule of the doctrine of at-will employment, that "no cause of action exists based upon an employer's termination of an at-will employment relationship." *Id.*, 716 A.2d at 1233.

> Generally, an employer 'may discharge an employee with or without cause, at pleasure, unless restrained by some contract.' *Henry v. Pittsburgh & Lake Erie Railroad Company*, 139 Pa. 289, 297, 21 A. 157 (1891). 'Absent a statutory or contractual provision to the contrary, the law has taken for granted the power of either party to terminate an employment relationship for any or no reason.' *Geary v. U.S. Steel Corporation*, 456 Pa. 171, 175, 319 A.2d 174, 176 (1974).

*Id.*, 716 A.2d at 1233. The Court went on to recognize, however, that public policy may operate to qualify this privilege enjoyed by an employer. It noted that public policy must be ascertained by reference to laws and legal precedent, not from general considerations of the public interest.

*Id.*, 716 A.2d at 1237 (citation omitted). After analysis of the Workers' Compensation Act, 77 P.S. §§ 1 *et seq.*, as well as acknowledgement of the power of the courts to pronounce public policy, our Supreme Court held that "a cause of action exists under Pennsylvania law for wrongful discharge of an employee who files a claim for workers' compensation benefits." *Shick*, 716 A.2d at 1238. In a concurring opinion, then-Chief Justice Flaherty emphasized, however, that *Shick* did not create or expand any cause of action: "The at-will employment doctrine remains the law in Pennsylvania and exceptions are extremely limited." *Id.*, 716 A.2d at 1238 (Flaherty, C.J., concurring).

¶ 4 The novel question presented is whether *Shick* should be interpreted to permit Ted's cause of action as a co-worker and/or father of an employee filing a claim for workers' compensation benefits. Stated another way, it must be decided whether a cause of action exists for the wrongful discharge of a third party in retaliation for another employee's claim for workers' compensation benefits. My research has revealed few cases where a similar issue was presented, and none directly resolving the question. *See, e.g., Clay v. Advanced Computer Applications, Inc.*, 522 Pa. 86, 559 A.2d 917 (1989) (where our Supreme Court did not reach the question of whether a husband and wife could pursue an action for wrongful discharge when they alleged that their employment was terminated following the wife's rejection of the sexual advances of a supervisor; the Court instead agreed with the trial court that the plaintiffs failed to exhaust the administrative remedies available under the Pennsylvania Human Relations Act, 43 P.S. §§ 951 *et seq.*, specifical-

---

**3.** There is no dispute that Ted was an at-will employee of Appellant. *See* Brief for Appellant at 15; Brief for Appellee at 6.

ly by asserting a claim before the Human Relations Commission which had initial jurisdiction over the matter); *Burkholder v. Hutchison,* 403 Pa.Super. 498, 589 A.2d 721 (1991) (stating that the public policy exception to at-will employment is inapplicable to third parties who have not themselves fallen victim to an alleged wrongful discharge, but concluding that the appellant was not discharged and thus failed to establish her cause of action). The trial court, however, concluded that as a logical application of *Shick,* an at-will employee who fails or refuses to persuade a fellow employee to withdraw a claim for worker's compensation benefits may maintain a cause of action against the employer. Trial Court Opinion, 7/19/01, at 4.

¶ 5 Historically, the Courts of this Commonwealth have recognized the limited circumstances which allow a wrongful discharge claim by an at-will employee. I must reiterate our Supreme Court's recent caution in *Shick* that any public policy exception arises solely by reference to laws and legal precedent, and not from "general considerations of supposed public interest." 716 A.2d at 1237. *See also Pipkin v. Pennsylvania State Police,* 548 Pa. 1, 693 A.2d 190, 191 (1997) (no cause of action may be maintained for termination of the at-will relationship except where "clear mandates of public policy" are threatened). It is the public policy of this Commonwealth that is determinative, which is ascertained by examination of our own constitution, judicial decisions and legislation. *McLaughlin v. Gastrointestinal Specialists, Inc.,* 561 Pa. 307, 750 A.2d 283 (2000) (also noting that our Supreme Court "has steadfastly resisted any attempt to weaken the presumption of at-will employment in this Commonwealth.")

¶ 6 In its analysis in *Shick,* the Court explained that the Workers' Compensation Act addresses the relationship between employers and employees who have been injured and have suffered an economic loss. The Act itself is a compromise, giving immunity from lawsuits to an employer in exchange for a process for paying immediate, set benefits to an injured employee. As such, the balance achieved by this compromise would be disrupted if an employer could terminate an employee for filing a workers' compensation claim. *Id.,* 716 A.2d at 1237. Consequently, public policy dictates that an **employee** who files such a claim may institute a wrongful discharge action against his employer. *Id.*

¶ 7 In contrast, extending this cause of action to other persons has no clear basis in the Workers' Compensation Act, nor any other legal precedent herein applicable. While I am not unsympathetic to Ted's belief that he was unfairly placed in an awkward position, and am cognizant that some facets of general public interest might favor extending protection to him under these unique factual circumstances, such considerations are not sufficient. The fact remains that his cause of action must be rooted in the law. Public policy has, to date, been strictly limited to protecting the employee who files the workers compensation claim, and I am not persuaded that the narrow exception to the doctrine of at-will employment should be extended to co-workers, even one who is related to the injured employee.[4] Absent a clear mandate of public policy in this Commonwealth that third persons should also benefit from this narrow exception to the at-will employment doctrine, I conclude that his claim must necessarily fail.

4.  Equally problematic in a case such as this is the question of where the line should be drawn.

¶ 8 In summary, I believe that the trial court erred as a matter of law in permitting Ted's cause of action for wrongful discharge to be presented to the jury. Accordingly, I would conclude that Appellant is entitled to judgment n.o.v. on Ted's claims,[5] and would reverse the judgment entered in favor of Appellee Theodore Rothrock, and remand with instructions to the trial court to enter judgment n.o.v. in favor of Appellant on this claim.

---

**5.** I would, therefore, find it unnecessary to address remaining issues raised in Appellant's brief.