

2008 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-7-2008

# Brennan v. Cephalon Inc

Precedential or Non-Precedential: Non-Precedential

Docket No. 07-2702

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

Recommended Citation

"Brennan v. Cephalon Inc" (2008). *2008 Decisions.* Paper 400.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/400

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 07-2702

DAVID BRENNAN,
                                                    Appellant

v.

CEPHALON, INC., A CORPORATION;
FRANK BALDINO;
RICHARD KAPLAN;
TIM SHEENAN;
ARMANDO CORTEZ, AND JOHN DOES (FICTITIOUS NAMED DEFENDANTS)

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
(D.C. Civil No. 04-cv-03241)
District Judge:  The Honorable Noel L. Hillman

Submitted Under Third Circuit LAR 34.1(a)
September 22, 2008

Before: BARRY, AMBRO and GARTH, Circuit Judges

(Opinion Filed: October 7, 2008)

OPINION

BARRY, Circuit Judge

        In this case of alleged wrongful termination, David Brennan appeals the order of

the District Court granting summary judgment to his former employer, Cephalon, Inc. ("Cephalon"). We have jurisdiction under 28 U.S.C. § 1291, and will affirm.

I.

Cephalon is a biotechnology and drug company. In 2000, it acquired Anesta Corp., the developer and manufacturer of Actiq, a prescription opioid designed to treat cancer pain. As a condition of the Food and Drug Administration's ("FDA") approval of Actiq, Anesta agreed to a Risk Management Program ("RMP"). The RMP contains strict guidelines for the labeling, packaging, and marketing of Actiq. It also requires that Cephalon monitor and tabulate certain patient, prescription, and usage information and regularly report this information to the FDA.

In 2003, Brennan, an at-will employee, was assigned to audit Cephalon's compliance with the terms and conditions of the Actiq RMP. In October 2003, he prepared a report in which he concluded that Cephalon was not in compliance in various respects. Several times over the next six weeks, Brennan asked his supervisor, Cephalon's Assistant Director of Quality Assurance Tim Sheehan, for permission to distribute the report internally; Sheehan repeatedly refused to grant permission. Frustrated with what he perceived as a lack of action, Brennan told a co-worker on November 10, 2003 that he planned to submit his audit report directly to the FDA. This co-worker suggested that Brennan first speak to Cephalon's new Director of Quality Assurance—and Sheehan's direct supervisor—Armando Cortes. Brennan did so.

2

After Brennan spoke to Cortes, Cortes held a meeting on November 13, 2003 with Brennan, Sheehan, and Richard Kaplan, Cephalon's Vice President of Quality and Environmental Health and Safety. At that meeting, Kaplan told Brennan to mark his report "Confidential" and to organize a meeting with other participants in the Actiq audit to verify his conclusions.

On December 1, 2003, Brennan met with several audit participants, including Tracie Parker, a non-supervisory employee in the Regulatory Affairs Department. Parker argued against reporting that Cephalon was not in compliance, instructed that her name be removed from the audit report, and left the meeting for several minutes before returning with Kaplan. Although Kaplan asked Brennan several questions, he did not tell Brennan to alter his report. After Kaplan and Parker left, Brennan was given suggestions by other audit participants. He incorporated several of the suggestions into his revised report, which reached the same conclusion as before—namely, that Cephalon was not in compliance with the Actiq RMP. Brennan circulated this report to the heads of several departments, including Carol Marchione, the Director of Regulatory Affairs, who was responsible for preparing the internal response to the RMP report.

Marchione called a meeting for December 11, 2003 to formulate a plan for addressing the deficiencies outlined in the report. The assembled employees, including Brennan, Sheehan, Cortes, Kaplan, and Parker, discussed options for corrective action. Marchione summarized the meeting in a memorandum dated December 15, 2003, and

committed to a formal response by January 31, 2004. This deadline was not met.

On February 9, 2004 and on several days thereafter, Brennan spoke to Sheehan about the delay in responding to the report and proposed asking Marchione about her overdue response. Sheehan told Brennan to wait for approval from Cortes. By letters dated February 12, 2004, Cephalon terminated both Brennan and Sheehan. On or about February 19, 2004, Brennan sent a letter to the FDA disclosing Cephalon's noncompliance with the Actiq RMP.

In March 2004, Marchione circulated a draft memorandum containing written responses to the problem areas identified in Brennan's audit report and met with several employees to review this draft. On March 22, 2004, Marchione issued a memorandum with the final written responses to the RMP audit. At his deposition, Brennan testified that the March 22 memorandum was the type of document he would have expected to see in response to his audit report. He also stated that the report "indicated that there was progress in complying with the requirements of the risk management program and complying with the reporting requirements to the FDA." (SA 44.)

Cephalon maintains that Brennan's termination had nothing to do with the Actiq RMP report but rather was prompted by his unsatisfactory performance during the November 2003 audit of Orsymonde, a Cephalon-owned manufacturing facility in France. It claims that a subsequent "mock FDA inspection" of that facility in December 2003 and January 2004 revealed several violations requiring corrective action that Brennan failed to

4

detect only a few months earlier. The report of this mock inspection issued on February 6, 2004. Brennan's termination notice, sent less than a week later, specifically referenced his poor performance during the Orsymonde audit. Cephalon gave the same reason for its termination of Sheehan.

Brennan filed a complaint in June 2004 against Cephalon and several of its employees, raising a number of federal and state law claims. The gravamen of these claims was that he was discharged for (1) his insistence that Cephalon disclose the non-compliance data contained in the RMP report to the FDA or he would do so himself, and (2) his refusal to change his conclusion of non-compliance to compliance in his report. By orders dated March 2, 2005 and October 25, 2005, the District Court dismissed all of Brennan's claims with the exception of his wrongful discharge claim against Cephalon.[1]

On May 8, 2007, the District Court granted summary judgment in favor of Cephalon on Brennan's wrongful termination claim. Specifically, the Court determined that Brennan's termination did not fall under the public policy exception to Pennsylvania's at-will employment doctrine because Brennan: (1) did not identify a statutorily imposed duty to report his employer's non-compliance with the Actiq RMP; and (2) failed to adduce sufficient evidence that Cephalon directed him to falsify and/or conceal the results of his audit. Brennan now appeals.

---

[1] This matter was originally assigned to Hon. Freda L. Wolfson, who issued the March 2, 2005 and October 25, 2005 orders. It was then transferred to Hon. Noel L. Hillman, who oversaw discovery and issued the May 8, 2007 order of dismissal.

We exercise plenary review of grants of summary judgment. *Ye v. United States*, 484 F.3d 634, 636 (3d Cir. 2007). Summary judgment is appropriate where "there is no genuine issue as to any material fact" and judgment may be granted as a matter of law. Fed. R. Civ. P. 56(c).

In Pennsylvania, an at-will employee generally can be terminated for any reason, with or without cause. *Shick v. Shirey*, 716 A.2d 1231, 1233 (Pa. 1998). An exception to this rule exists in limited circumstances where the termination violates a clear mandate of public policy. *McLaughlin v. Gastrointestinal Specialists, Inc.*, 750 A.2d 283, 287 (Pa. 2000). Although the parameters of the public policy exception are not explicitly defined, the Pennsylvania courts generally have limited its application to situations in which an employer: (1) requires an employee to commit a crime; (2) prevents an employee from complying with a statutorily imposed duty; and (3) discharges an employee when specifically prohibited from doing so by statute.[2] *Hennessy v. Santiago*, 708 A.2d 1269, 1273 (Pa. Super. Ct. 1998) (citation omitted); *Fraser v. Nationwide Mut. Ins. Co.*, 352 F.3d 107, 111-12 (3d Cir. 2003).

Brennan argues that he was wrongfully terminated in violation of public policy because he had a statutory duty under certain federal and state criminal laws and under

---

[2] Brennan does not challenge the District Court's determination that the "third public policy exception is clearly not applicable here, because there is no statute that prohibits Cephalon's termination of Brennan." Addendum to App. 65 (11).

the RMP to submit the non-compliance data to the FDA, and failure to do so would have exposed him to criminal violations and civil liability. We note, parenthetically, that in making this argument, Brennan improperly conflates the first two prongs of the public policy exception, relying on the same criminal statutes in support of each. As the District Court put it, "Pennsylvania must have intended the 'statutorily imposed duty' exception and 'commit a crime' exception to be distinct from one another" lest the latter be "completely swallowed" by the former. Addendum to App. 65 (13).[3]

This is, at bottom a "statutorily imposed duty case," the "duty" purportedly emanating from 18 U.S.C. §§ 371 and 1001 and 18 Pa. Cons. Stat. Ann. § 4911. But none of these statutes imposed directly on Brennan an affirmative duty to report his audit findings to the FDA. Moreover, while the RMP requires that Cephalon disclose certain compliance indicators, it mandates neither an audit nor the disclosure of a report containing the findings of an audit. Indeed, Brennan concedes that the duty he invokes was only imputed to him and admits that he did not expect his report to be released to the FDA. This stands in stark contrast to *Field v. Philadelphia Electric Co.*, 565 A.2d 1170 (Pa. Super. Ct. 1989), in which the Pennsylvania Superior Court held that an employee who was terminated for reporting his employer's violations of Nuclear Regulatory Commission ("NRC") regulations stated a claim for common law wrongful discharge. *Id.*

---

[3] Any stand-alone argument that Cephalon required him to falsify or conceal the findings in his report in violation of 18 U.S.C. §§ 371 and 1001 and 18 Pa. Cons. Stat. Ann. § 4911 is patently without merit if for no other reason than that there is little or no evidence to support it.

at 1180-81. The court stressed that the employee had a clear and direct affirmative duty under the Energy Reorganization Act of 1974, 42 U.S.C. § 5846, to report his employer's failure to comply with NRC regulations and faced fines if he failed to do so. *Field*, 565 A.2d at 1176-77, 1180. Here, in the absence of a similarly clear and direct duty of disclosure, the statutorily imposed duty prong of the exception is not applicable. [4]

## III.

We will affirm the judgment of the District Court.

---

[4] Brennan argues that the District Court improperly credited Cephalon's explanation that it terminated his employment because of the Orsymonde audit. However, the District Court discussed the evidentiary support for Cephalon's explanation only in the alternative. *See* App. 96. Given our disposition of this case, we need not address this alternative conclusion and whether there were factual disputes which should have prevented that conclusion on summary judgment.